## WILSON v. ATLANTIC COAST LINE R. CO.

### (Circuit Court, N. D. Georgia.  April 30, 1904.)

### No. 1,765.

1. CARRIERS—SPECIAL SERVICES—CIRCUS TRAINS—LIABILITY FOR NEGLIGENCE —SPECIAL CONTRACT—VALIDITY—PUBLIC POLICY.

Where a railroad company agreed to haul certain cars of the proprietor of a circus according to a special schedule, and for a price less than the regular ·rates for such service, the carrier's servants having no right to direct the loading or unloading, which was in the exclusive charge of the employés of the circus company, an express contract between the parties, exempting the carrier from liability for the negligence of its employés, and releasing the carrier from liability for loss and damage to any of the circus company's property, menagerie, cars, or equipment while in transit, and to indemnify the carrier against damage or injury to any of the circus company's officers, agents, performers, or employés, was not invalid, as contrary to public policy.

2. SAME—PLEADING—DEMURRER.

Where a shipper brought suit on a special transportation contract against the carrier for damages to his property, the contract providing that it was made in consideration of reduced rates granted to the shipper, he could not contend, on demurrer to the petition, that the statement in the contract that a reduced rate was given was false.

3. SAME—ACTION EX DELICTO.

Where a circus proprietor brought suit in tort to recover damages for injuries to a circus train, transported over the line of defendant railroad company under a contract exempting the carrier from liability for negligence, and providing that the carrier's obligation should be that of a private carrier only, a petition alleging such contract as matter of inducement only, and charging that the same was illegal and void as beyond the carrier's corporate capacity, and that the transportation of shows, theaters, and circuses was a part of defendant's regular business ·as a carrier, was demurrable.

4. SAME—CHARACTER OF TRANSPORTATION—PRIVATE CARRIER.

A railroad company is not required, as a common carrier, to take a circus train, a part of which is loaded with wild animals, and transport the same over its line, but may refuse to transport such train, except under a special contract limiting its liability to that assumed by a private carrier.

Burton Smith and George Gordon, for complainant.
F. G. Du Bignon and R. C. Alston, for defendant.

NEWMAN, District Judge.  This suit was brought originally in the city court of Atlanta, and removed by defendant to ·this court on the ground of adverse citizenship; the plaintiff being a citizen and resident of the state of Virginia, and the defendant a North Carolina corporation.  The declaration alleges that the plaintiff is the owner and general manager of the "W. H. Harris Nickle Plate Shows"; that being the trade-name under which the plaintiff carries on his business of showman.  Said show is not incorporated.  It alleges that the defendant railroad corporation has damaged him in the sum of $15,000.  The allegations on which the complaint is founded are as follows:

"That defendant, on the 15th day of September, 1902, entered into a contract with plaintiff, wherein the defendant agreed for a consideration to

¶ 4. See Carriers, vol. 9, Cent. Dig. § 648.

transport plaintiff's show from the city of Montgomery, Alabama, to Valdosta, Georgia, stopping at various places along defendant's line of railroad for the purpose of allowing plaintiff to exhibit his show. A copy of the contract is attached. Plaintiff, relying on the defendant's performance of said contract, arranged dates for exhibiting along the line of defendant's railroad, and went to an expense of one thousand dollars in preparing for and advertising said exhibitions, of which fact defendant had full knowledge. Defendant well knew, when it contracted to transport plaintiff and his show along the line of its railroad, the character of the business in which plaintiff was engaged, the importance of plaintiff's show being transported from place to place at the times specified, and the consequences to plaintiff of delay in such transportation; and plaintiff further shows that defendant undertook to transport plaintiff and his show, with full knowledge of all the facts, and agreed in its capacity of common carrier to transport and care for plaintiff and his property. That on or about October 28, 1902, defendant undertook to move plaintiff's said show from Dothan, Alabama, to Bainbridge, Georgia, when, by reason of the unsafe and defective condition of defendant's track and appliances, and the negligence and carelessness of defendant's servants, two of plaintiff's cars, loaded with plaintiff's animals, wagons, tents, and other paraphernalia used by plaintiff in connection with his said show, were ditched, and his said property broken up and destroyed."

It is alleged that the plaintiff's cars being moved from the siding at Dothan, Ala., into the main track of defendant's road, preparatory to transporting the show to Bainbridge, when, by reason of the defective and unsafe condition of defendant's said track and appliances, and by reason of the negligence and unskillfulness of defendant's servants and employés, plaintiff's cars were wrecked, and his property damaged. It is alleged that defendant's track was defective and unsafe, in that a large rail was joined to a smaller one, and the ends of said rails were not fastened together with fishplates, as safety required, but were simply spiked to the ties, making an extremely crude and unsafe joining of said tracks or rails. It is alleged that the uneven and defective joining of said two rails was on the curve of the track where said side track curved in to join the main track, and was on the outside of said curve, making the place doubly dangerous on account of the fact that at such a place the weight of the cars would be mainly thrown upon said outside rail at the defective joint, thus crowding it out, and allowing the wheels to drop down upon the ties. It is alleged that the defective and unsafe joining of said rails was due to the negligence of the defendant, its officers and agents in charge of its track, and that this defective and dangerous condition of its track defendant well knew, or could by the exercise of ordinary care have discovered; that by reason of the dangerous and defective condition of the track two of plaintiff's cars were derailed, turned over, and broken to pieces, his wagons which were loaded on said cars were thrown off and broken up, his tent poles, seats, and canvas were broken and smashed and otherwise damaged, the wagon known as the "bank wagon" and "lion den" was turned over and demolished. One of plaintiff's lions was so injured that it subsequently died, and another one so injured as to be of no further use to plaintiff. The damage to plaintiff's cars, wagons, seats, poles, canvas, lions, and other property amounted to $4,000. It is further alleged that by reason of said wreck, occasioned by defendant's negligence, the plaintiff was greatly delayed, and was unable to exhibit his show at Bainbridge on October 28, 1902, as he had advertised and arranged to do, and as defendant knew he had arranged to do, whereby plaintiff

lost that day's exhibition, to his damage $800; that by reason of the wreck and the destruction of his wagons and paraphernalia, plaintiff was unable to have any street parade of his show for 22 days following said wreck, and that by losing these parades he lost $200 per day, or an aggregate of $4,400; that the expense occasioned to the plaintiff by the extra men, horses, and wagons necessary for such a street parade as the plaintiff had daily in connection with his show as an advertisement was $200 per day; that this expense was occasioned for 22 days after the accident, to the plaintiff's aggregate damage $4,400; that the daily expense of maintaining plaintiff's show is $400, and for the day plaintiff was scheduled to show at Bainbridge he paid expenses to the amount of $400, being deprived of any return therefor by reason of defendant's negligence. It was then alleged that the defendant is a common carrier, and is obliged by law to accept and transport all goods, animals, and other property offered to it for transportation over its line of railroad, but plaintiff shows that now regarding its duty as a common carrier, defendant refused to receive and transport his show until he should sign the contract heretofore mentioned and fully set out in "Exhibit A." Plaintiff alleges that said contract was forced on him, and that, in so far as it purports to excuse defendant from its legal liability as a common carrier, and to limit its liability unreasonably as to items of damage to be suffered by plaintiff, it is against public policy and void. It is then alleged that the allegations of consideration of reduced rates contained in said contract is false, and that, on the contrary, defendant charged plaintiff double what he had formerly paid defendant for the same service; and that when he objected to the price demanded by defendant on this occasion he was informed that he must pay defendant's price or walk; and, in so far as said contract attempts to limit defendant's liability, it is without consideration.

The contract, which is attached to the declaration, is as follows:

### Atlantic Coast Line Railroad Company.

#### Circus Contract.

An Agreement made this 15th day of September, 1902, by and between the Atlantic Coast Line Railroad Company, hereinafter styled and called the railroad company, of the first part, and W. H. Harris (Nickel) Plate Shows hereinafter styled and called a circus company, of the second part.

Whereas, the Circus Company is the owner of a circus and menagerie, including horses, wild animals and other live stock, and tents and other paraphernalia usually used as a part of a circus and menagerie, and is also the owner of certain railroad cars especially designed and made for the carriage and transportation of the circus, its animals, tents, paraphernalia and performers in the said circus and of the agents and servants of the said circus company employed in and about the same, and

Whereas, the Circus Company is desirous to give exhibitions of its said circus and menagerie at various points on the lines of railroad of the Railroad Company, and to that end to have its railroad cars loaded with all of its said circus, paraphernalia, tents, equipments, horses, wild animals, live stock and also its performers, agents and servants moved over the lines of railroad of the said railroad company from point to point where exhibits are to be given by the said Circus Company and upon a schedule different from any in use by the said railroad company; and

Whereas, it has been expressly stipulated and agreed between the said parties that the said railroad company, by reason of the unusual services which it is to perform for the said circus company under the contract, not only in

the manner of transporting of the said persons and property and of the schedules to be used in the said transportation, but also of the reduced and unusual rates charged for such services, makes this contract, not as a common carrier, but as a private carrier, and its liability for any breach of this contract or for any damages arising hereunder, or by reason hereof, shall be that of a private and not a common carrier.

Now Therefore, this Agreement witnesseth That the railroad Company, for and in consideration of the sums of money to be paid to it by the Circus Company, as hereinafter provided, and of the stipulations and agreements herein set forth, agrees with the said Circus Company,

(1) That it will furnish unto the circus company the use of its railroad and all such locomotives engines and train crews as may be necessary to transport and move 3 coaches, 2 stock cars and 3 flat cars. Advertising car, free; cars for said circus company, containing the circus, menagerie, paraphernalia, equipments, performers and employés of the circus company from point to point upon the lines of railroad of the Railroad Company, upon the following proposed itinerary and schedule, to wit;

| Leave. | Time. | Date. | To be Hauled for Ex. at | Special Release Rate. |
|---|---|---|---|---|
| Montgomery | M-night | Oct. 20th | Troy | $129 00 |
| Troy | " | Oct. 21st | Ozark | 105 00 |
| Ozark | " | Oct. 22d | Elba | 121 00 |
| Elba | " | Oct. 23d | Enterprize | 63 00 |
| Enterprize | " | Oct. 24th | Abbeville | 137 00 |
| Abbeville | " | Oct. 25th | Dothan | 91 00 |
| Dothan | " | Oct. 27th | Bainbridge | 135 00 |
| Bainbridge | " | Oct. 28th | Valdosta | 185 00 |
| | | | | $966 00 |

Should it become necessary to change the above routes or dates, the circus company shall have the privilege of making such change by giving the Railroad Company ten days notice beforehand.

(2) The railroad company agrees to furnish the side track necessary for unloading and re-loading the said train at each point in the said schedule at which a stoppage for exhibition is to be made to the extent of the existing side track room at such point, less the space occupied by such freight cars as may be at the station and the space necessary for the free and safe passage of their trains on the main track, and also an engine to shift the cars during the loading and unloading thereof.

(3) The trains shall not be run at a higher rate of speed than fifteen miles an hour over any part of the road, unless by some unforeseen accident or event it shall become necessary to increase such speed in order to arrive at the point of exhibition at the time above specified.

(4) That the railroad company will haul free for the said circus company an advertising car over its road on its freight or accommodation trains between the points named in the above schedule and pass free on its passenger trains bill posters in actual service, baggagemen, advertising agents and baggage and advertising material of the said Circus Company.

In consideration of all of the which and of the greatly reduced rates given by the railroad company to the circus company, the circus company covenants and agrees as follows:

(1) To pay to the said railroad company the sum of Nine hundred and sixty-six dollars and $^{00}/_{100}$ payable as follows at points of shipment and at rates named.

(2) The circus company for the consideration herein set forth agrees to release and discharge and does hereby release and discharge the said railroad company from all liability for loss of, or damage to, any of its property, menagerie, cars and equipments which the same may sustain while in trans-

port over or upon the lines of the railroad company, and to indemnify and save harmless the railroad company for and against any damage or injury to the person of any of its officers, agents, performers servants or employés which may happen or occur upon its line of railroad.

(3) That the railroad company shall have a lien upon any and all of the property of the Circus Company as security for all sums of money due the railroad company by the circus company under the provisions of this contract.

(4) That the railroad company shall not be required to run more than seventy-five miles from one exhibition point to another as specified in its schedule within the usual time, eight hours, or between the hours of 11 p. m. and 9 a. m.

(5) That the railroad company shall have the power and option at any and all times to inspect the cars of the circus company, and to reject any or all the railroad company shall see fit, until such repairs, alterations or additions are made to the said cars as the railroad company may demand for their free and safe transportation over its lines. Such repairs, alterations and additions, and all material furnished and work done upon the said cars while on the lines of the railroad company shall be at the expense of the said circus company, and shall be paid before the said cars can be moved by it off of the lines of the said railroad company.

(6) If any damage shall be done to the cars of the circus company, for which the railroad company may be held legally liable, the circus company shall permit the railroad company to repair such damage at such time and place within ninety days after such damage as the railroad company elect. But the railroad company shall use all reasonable dispatch in making the same.

(7) If the railroad company shall for any cause be held liable for the loss of or injury to any of the animals transported by it under this contract, it is agreed that the said animals shall be valued at their actual value and in no instance at a higher price or value than herein stipulated, as follows:

| | |
|---|---:|
| Elephants, Hippopotami, Giraffes, Rhinoceroses | $500 00 |
| Horses and Zebras | 100 00 |
| All other members of the equine species | 50 00 |
| Lions and Tigers | 100 00 |
| Leopards | 50 00 |
| All other members of the feline species | 20 00 |
| Buffaloes, and all other members of the bovine species | 50 00 |
| Seals | 10 00 |
| Monkeys, and all other animals not specified | 5 00 |
| Birds, all species of | 5 00 |
| Crocodiles, Alligators, Serpents, and other reptilia | 5 00 |
| All other animals not specified | 5 00 |

(8) That the circus company shall and will load and unload the said cars at all points of stoppage as per the above schedule, at its own proper cost, expense and risk, and that it shall and will comply with all of the provisions of the Statutes of the United States or of any State through which the said animals and live stock may be moved over the lines of the said railroad company in respect to the periodical loading, unloading, feeding and watering of the said animals and live stock during the transportation.

(9) That the railroad company shall not be liable to the circus company for any damages or loss of profits at any point of exhibition or stoppage upon the said schedule by reason of any violation of the railroad company to transport the cars of the circus company on time as per the above schedule or any agreed variation of the same.

In Witness Whereof, the parties hereto have caused these presents to be executed by their respective agents thereto duly authorized, on the day and year first above written.

Executed in duplicate, of which one part to each of the said parties.

The Atlantic Coast Line Railroad Co.,
By Jas. Menzies, G. O. F.
Chas. C. Wilson, Mgr. Harris Shows.

Witness:   C. L. Whaley.

It appears from the foregoing contract that the plaintiff owned the railroad cars in which its circus was to be transported, and that they were specially constructed and designed for that purpose; that among the things to be transported were wild animals and live stock; that a special schedule was arranged by the railroad company for the plaintiff to suit his convenience and desires in giving exhibitions, and that what is called in the contract a "special release rate" was given by the railroad company to the plaintiff for this service to be rendered. It is then specially stipulated and agreed that by reason of the unusual character of the service, and of the rates given, the contract was made by the defendant company not as a common carrier, but as a private carrier, and its liability for any breach of the contract, or any damage thereunder or by reason thereof, should be as a private carrier, and not as a common carrier.

It is then stipulated that for the consideration set forth the circus company releases and discharges the railroad company from all liability for loss and damage to any of its property, menagerie, cars, or equipments which the same may sustain while in transit over or upon the lines of the railroad company; and to indemnify and save harmless the railroad company for or against any damage or injury to the persons of any of its officers, agents, performers, or employés which might happen or occur upon defendant's line of railroad.

The case is now heard on a demurrer to the declaration, and the question for consideration is whether or not this is a valid contract of release, and whether the contract which makes the obligation of the railroad company that of a private carrier, and not that of a common carrier, is valid and binding. Counsel for plaintiff relies largely upon the important case of Railroad Co. v. Lockwood, 17 Wall. 357, 21 L. Ed. 627, which has for a long time been regarded as a leading case upon the subject of the validity of contracts made by railroad companies releasing themselves from liability for negligence in the performance of their duty as common carriers. The conclusions reached by the court in the Lockwood Case, so far as applicable here, were as follows: "(1) A common carrier cannot lawfully stipulate for exemption from responsibility when such exemption is not just and reasonable in the eye of the law. (2) It is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants."

It is to be determined here how far these rules apply to a case like the present, where a railroad company undertakes to transport for a circus company a train of cars owned by the circus company on schedules arranged to suit the engagements of the circus company, and with the other stipulations and agreements expressed in this contract. The case of Chicago, M. & St. P. R. R. Co. v. Wallace, 66 Fed. 506, 14 C. C. A. 257, 30 L. R. A. 161, decided by the Circuit Court of Appeals for the Seventh Circuit, was a case very much like this. It was a suit by the owner of a circus against the railroad company for damages caused by the derailment of the circus train, and which the railroad company had undertaken to carry under a special contract, in essential particulars very much like the contract in this case. The decision of the court in that case will appear from the syllabus, which is as follows:

"The C. R. Co. made a special contract in writing with one W., the proprietor of a circus, to haul a special train, consisting of cars owned by W., containing the circus property, equipment, and performers, between certain points, on stated days, at prices specified, which were less than the regular rates of the company for transportation of passengers and freight. It was provided in the contract that, in consideration of the reduced rate and of the increased risks to the property of the railroad company in running such special train, said company should not be liable for any damage to the persons or property of the circus company from whatever cause. It was not the regular business or the custom of the railroad company to haul such special trains of private cars, or to transport persons, animals, and freight on the same trains. Held, that the railroad company, in carrying W.'s property on such special train, acted as a private, and not as a common, carrier; that as such it had the right to make the contract stipulating against liability for damage; and that such contract was binding upon the parties."

In the opinion by Judge Bunn reference is made to the case of Railroad Company v. Lockwood, supra, and this quotation is made from it:

"A common carrier may undoubtedly become a private carrier, or bailee for hire, when, as a matter of accommodation or special engagement, he undertakes to carry something which it is not his business to carry."

Reference is also made to the cases of Coup v. Railroad Co., 56 Mich. 111, 22 N. W. 215, 56 Am. Rep. 374, and Robertson v. Railroad Co., 156 Mass. 525, 31 N. E. 650, 32 Am. St. Rep. 482.

In Coup v. Railroad Co., it is said in the opinion of the court:

"The business of common carrier, while it prevents any right to refuse the carriage of property such as is generally carried, implies, especially on railroads, that the business will be done on trains made up by the carrier, and running on their own time. It is never the duty of a carrier, as such, to make up special trains on demand, or to drive such trains made up entirely by other persons, or by their cars. It is not important now to consider how far, except as to the owners of goods in the cars forwarded, the reception of cars, loaded or unloaded, involves the responsibility of carriers as to the owners of the cars as such. The duty to receive cars of other persons, when existing, is usually fixed by the railroad laws, and not by the common law. But it is not incumbent on companies, in their duty as common carriers, to move such cars, except in their own routine. They are not obliged to accept and run them at all times and seasons, and not in the ordinary course of business. The contract before us involves very few things ordinarily undertaken by carriers. The trains were to be made up entirely of cars which belonged to plaintiff, and which the defendant neither loaded nor prepared, and into the arrangement of which, and the stowing and placing of their contents, defendant had no power to meddle. The cars contained horses which were entirely under control of plaintiff, and which, under any circumstances, may involve special risks. They contained an elephant, which might very easily involve difficulty, especially in case of accident. They contained wild animals, which defendant's men could not handle, and which might also become troublesome and dangerous. It has always been held that it is not incumbent on carriers to assume the burden and risks of such carriage. The trains were not to be run at the option of the defendant, but had short routes and special stoppages, and were to be run on some part of the road chiefly during the night. They were to wait over for exhibitions, and the times were fixed with reference to these exhibitions, and not to suit the defendant's convenience. There was also a divided authority, so that, while defendant's men were to attend to the moving of the trains, they had nothing to do with loading and unloading cars, and had no right of access or regulation in the cars themselves. It cannot be claimed on any legal principle that plaintiff could, as a matter of right, call upon defendant to move his trains under such circumstances and on such conditions, and, if he could not, then he could only do so on such terms as defendant saw fit

to accept. It was perfectly legal and proper, for the greatly reduced price, and with the risks and trouble arising out of moving peculiar cars and peculiar contents on special excursions and stoppages, to stipulate for exemption from responsibility for consequences which might follow from carelessness of their servants while in this special employment. How far, in the absence of contract, they would be liable in such a mixed employment, where plaintiff's men as well as their own had duties to perform connected with the movement and arrangement of the business, we need not consider."

In Robertson v. Railroad Co., 156 Mass. 525, 31 N. E. 650, 32 Am. St. Rep. 482, the decision is stated in the headnote, and reads as follows:

"A railroad company agreed to haul certain cars of the proprietors of a circus according to a certain schedule of time, and for a price less than the regular rates for such service, the proprietors agreeing at their own expense to load and unload the cars, to save the defendant harmless from all claims for damages to persons and property, however accruing, and to 'assume all risk of accident from any cause.' An accident occurred by one of the cars running off the track by reason of its trucks not being in proper condition, and an employé of the proprietors, who was riding in one of the cars, was injured. *Held*, in an action for injuries by the employé against the company, that he could not recover, as the defendant had no control over the condition of the cars, and no power to interfere with them, as the contract was simply to haul the cars as they were, which contract the defendant had a right to make, and as it was under no obligation to draw the cars as a common carrier."

But I think the case of Railway Co. v. Voight, 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560, is absolutely controlling on the principal question in this case. That was a suit by an express messenger against the railway company for damages for injuries sustained in a collision between two trains on the defendant's road. The question in the case was certified by the judges of the Circuit Court of Appeals for the Sixth Circuit to the Supreme Court. The facts appearing were that the railroad company had a contract with the express company to furnish cars suitable for transporting express matter, and to transport its employés free, the express company agreeing to protect the railroad company and hold it harmless from all liability the railroad company might be under to the employés of the express company for injuries they might sustain in being transported by the railroad company over its line as express messengers, whether the injuries were caused by negligence of the railroad company or its employés or otherwise. The plaintiff, an express messenger, had made a contract with the express company by which he had assumed all risk of accidents or injuries he might sustain in the course of his employment occasioned by negligence, and whether resulting in death or otherwise, and agreed to indemnify and hold harmless the express company as to any and all claims which might be made against it on his part, whether the injuries resulted from negligence or otherwise, and agreeing to release the transportation lines (the railway) from all claims and demands or causes of action arising out of any injury, and ratifying the agreement made between the express company and the transportation company to the same effect. The question submitted was decided by the Supreme Court in favor of the railway company, Mr. Justice Harlan dissenting. The important part of the case in this connection is the reference made in the opinion of the court by Mr.

Justice Shiras to the cases of Robertson v. Old Colony Railroad, supra, Coup v. Railroad Co., supra, and to the decision by the Circuit Court of Appeals for the Seventh Circuit in Chicago, M. & St. P. R. R. Co. v. Wallace, supra. These cases are cited and referred to in a way which seems undoubtedly to mean an approval of them. This occurs in the opinion:

"Where a railroad company made a special contract in writing with the owner of a circus to haul a special train between certain points at specified prices, and stipulating that the railroad company should not be liable for any damage to the persons or property of the circus company from whatever cause, it was held by the Circuit Court of Appeals for the Seventh Circuit citing Coup v. Railroad Co., 56 Mich. 111, and Robertson v. Old Colony Railroad, 156 Mass. 506, that the railroad company was not acting as a common carrier, and was not liable under the contract for injuries occasioned by negligent management of its trains."

"In its opinion the court quoted the following passage from Railroad v. Lockwood: 'A common carrier may undoubtedly become a private carrier or bailee for hire when, as a matter of accommodation or special engagement, he undertakes to carry something which it is not his business to carry.' Chicago, Milwaukee & St. P. Railroad v. Wallace, 24 U. S. App. 589, 66 Fed. 506, 14 C. C. A. 257, 30 L. R. A. 161."

While, therefore, the immediate question for determination in the Voigt Case was the rights of an express messenger who had released the express company, and the express company had released the railroad company, still I think the necessary effect of the decision, and especially the citation by the court of the authorities named with apparent approval, was to include the cases of special contracts like the one before the court for hauling circus trains, and by so including them to distinguish them from the class of contracts for exempted liability by railroads, covered by the decision in the Lockwood case.

It is alleged in the plaintiff's petition that the statement in the contract that a reduced rate was given by the railroad company is false. The plaintiff contends, therefore, as I understand it, that, as this case is now being heard on a demurrer, it must stand as if no reduced rate had been given, and consequently the basis or consideration for the contract of release does not for present purposes exist. The difficulty about this contention is that the plaintiff sues on the contract. This is manifest from the declaration. I do not see how the plaintiff can sue upon the contract, and then deny its terms, in this respect at least.

It is also alleged in the plaintiff's declaration that the defendant is a common carrier, and is obliged by law to accept and transport goods, animals, and other property offered for transportation over its line of railroad, but that it refused to transport plaintiff's show unless he would sign the contract in question; that the contract was forced on plaintiff, and is against public policy and void. A railroad company is certainly not required, as a common carrier, to take a circus train belonging to a circus company, a part of which is loaded with wild animals, and transport it over its line on a schedule to be arranged by the circus company. This is clearly held in the authorities cited above, and which, as stated, are believed to have received the approval of the Supreme Court.

## On Demurrer to Amended Declaration.

### (May 21, 1904.)

After the foregoing opinion was filed, counsel for plaintiff, having previously asked leave to do so, filed an amendment to his declaration as follows:

"Now comes the plaintiff in the above-stated case, and, having first obtained leave of court, amends his declaration heretofore filed, and for such amendment says:

"(1) He shows that his action is founded upon the tort committed on him by defendant, as is more fully set out in his said declaration, and not upon the contract mentioned in said declaration and set out in the exhibit attached thereto; that said contract is set out and described by plaintiff, not as the ground and basis of his action, but as a matter of inducement merely, and showing his relation to said defendant; and that he seeks recovery, not for the 'breach of any contract, but for the tort negligently committed on him and his property by said defendant. He further shows that in setting out said contract in his said declaration he does not ratify nor approve same, nor admit himself bound by the terms thereof.

"(2) He shows further that said contract is illegal and void, in that it is an attempt on the part of a public carrier, which plaintiff alleges defendant to be, to act and contract as a "private carrier," in which capacity, plaintiff alleges, defendant could not, under its charter, by which it was made a public carrier, act or contract; and plaintiff alleges, further, that said contract is an attempt on the part of defendant to make of itself something other and different from that which it is made by its charter, and having different powers, duties, and liabilities from those conferred and imposed upon it by its said charter. Plaintiff alleges that, in so far as said contract attempts to make of defendant a private carrier, it is ultra vires and illegal.

"(3) Plaintiff further alleges that to transport, in their own cars and in the manner in which plaintiff's show was being transported by defendant, shows, theater companies, and circuses from place to place along their lines of railroad, on special schedules arranged for the convenience of both carrier and carried, is a part of the common and ordinary business in which railroad companies in general and this defendant in particular are authorized by their charters to engage, and in which they do in fact engage; that defendant has a printed form of contract prepared, under which it undertakes this branch of its business; and that it was and is customary, and a part of the business of all railroads in general and of this defendant in particular, to transport along their lines of railroad shows and circuses, in their own cars, and in the manner in which plaintiff's show was being transported under the contract set out in plaintiff's declaration heretofore filed."

Thereupon counsel for defendant renewed the demurrer to the declaration as amended, and, after argument, the demurrer, so renewed, was sustained.