## HABITZ *v.* WABASH RAILROAD CO.

1. MASTER AND SERVANT—EVIDENCE.

   Upon an examination of the entire record, a finding of the jury that decedent was run over at the place where his body was discovered, is sustained as warranted by the proofs. MC-ALVAY and BROOKE, JJ., dissenting.

2. SAME—NEGLIGENCE OF FELLOW-SERVANT.

   Where decedent, an inspector of cars, was run over while he was in the performance of his duties, and it appeared that the foreman of inspectors, who was charged with the duty of seeing that the other inspectors were out of the way before starting the train, knew that decedent was ordered and expected to assist in the inspection, supposed he was on the opposite side of the train, and took no steps to ascertain that decedent was out of danger when the foreman by signal started the train, there was evidence of the foreman's negligence.

3. SAME—STATUTES—SURVIVAL ACT.

   Act No. 104, Pub. Acts 1909, abolishing the fellow-servant rule as to common carrier railroad companies, did not change or repeal the survival act or prevent recovery thereunder for the negligent killing of a servant.

4. Appeal and Error—Saving Questions for Review—Excep-
   tions.
   A mere exception to alleged improper argument, without ob-
   jecting or asking for a ruling on the matter, is insufficient to
   raise the point on error.

Error to Wayne; Codd, J.    Submitted January 9,
1912.   (Docket No. 13.)   Decided May 3, 1912.

Case by Anna Habitz, as administratrix of the estate of
Ferdinand Habitz, deceased, against the Wabash Railroad
Company for the negligent killing of decedent.   Judgment
for plaintiff.   Defendant brings error.   Affirmed.

*Rufus G. Lathrop* and *Alexander L. Smith,* for ap-
pellant.

*Dohany & Dohany,* for appellee.

Blair, J.    The action below was brought by Anna
Habitz, as administratrix of her husband, Ferdinand
Habitz, against the defendant company to recover dam-
ages for injuries received by deceased while working in
the railway yard of defendant near Detroit, known as the
Oakwood yards, on the 4th day of August, 1910, which
resulted in his death a few days later.   The action is
brought under Act No. 104 of the Public Acts of 1909.

Deceased was an inspector in the employ of defendant.
It was part of his duty to assist in inspecting outbound
freight trains to see that the air brakes were working
properly, the connections properly made, etc.    There
were three men employed in this work at the time of the
accident—the deceased, his brother, Adolph Habitz, and
August Wichman.    Wichman was the foreman of the
inspectors.    The accident occurred in the early morning
of August 4th.    There was no eyewitness of the accident.

The declaration, after setting forth at some length the
duties of defendant to decedent, states the cause of action
as follows:

"By reason whereof, on the said 4th day of August,
A. D. 1910, while plaintiff's intestate was engaged as an

oiler oiling a car in defendant's yards, and while he was in the exercise of due care and caution and free from negligence on his part, and while he had been in defendant's employ less than 20 hours, and while the defendant was guilty of neglect, as above set forth, a certain train crew, operating an engine and cars, carelessly, negligently, and recklessly caused the same to be propelled at a rapid rate of speed to and against the car which plaintiff's intestate was engaged in oiling, without giving any warning whatsoever to him, causing a violent collision, as a result of which plaintiff's intestate's left foot was crushed, and he was otherwise greatly injured, causing her said intestate to suffer intense and excruciating pain, and causing his death to result on the 8th day of August thereafter."

At the trial, however, this claim was abandoned, and the case was based on the claim that at the time he was hurt deceased was engaged in inspecting a certain outbound freight train standing on a track, known as No. 1 track; and that while so engaged the train was started on a signal given by Wichman, the foreman, who was careless in not assuring himself that Habitz was not under or between the cars. And it was on this theory that the case was submitted to the jury. Plaintiff recovered verdict and judgment for $6,000.

Defendant asks for a reversal of the judgment upon the following grounds:

"(1) The evidence does not warrant the verdict. This for the reasons: (*a*) There is no evidence that deceased was run over at the spot where he was found. On the contrary, the undisputed evidence shows that he was hurt at another place entirely. (*b*) There is no evidence fairly tending to charge Wichman with negligence. (*c*) There is a complete variance between the declaration and the proofs.

"(2) The court erred in instructing the jury on the measure of damages, as requested by the plaintiff.

"(3) During his closing argument to the jury, Mr. Dohany made the following statement:

"'*Mr. Dohany:* They know that no trains moved on track 6 that night. They have the records and the train crew, who know whether the trains came in here; and they have the records to show that trains come and are moved on different tracks, and if

trains were moved on track 6 that night between 9 o'clock and 4 o'clock. With all of their resources, they are able to produce testimony to refute the testimony that we have given tending to show that no trains were moved on that track that night.'"

1. (a) The testimony on behalf of plaintiff tends to show that, a half hour or so before daylight on August 4th, the deceased, Ferdinand, came to the foreman's shanty after the crew had inspected the Buffalo train, and inquired what they were to do next, to which the foreman replied that they would eat their lunch, and then all three go out and inspect a freight train of some 80 cars standing on No. 1 track, which was the track immediately north of the passenger track; that Ferdinand then went out, taking his lantern and an air hose, ostensibly to eat his lunch in the oilhouse; that some 10 or 15 minutes later the foreman and Adolph went out to inspect the train; that it was getting daylight when they started, and they looked around for Ferdinand, but did not see him; that the foreman said he thought he was on the south side of the train, and he and Adolph went down the north side, the brakeman walking along ahead of them on the same side; that it was customary to inspect both sides of the train; that it took about 25 minutes to make the inspection, and they did not see Ferdinand during that time; that when they got to the caboose Adolph—

"Looked over and asked him if he saw Ferdinand, and he said, 'No.' He said he thought he was on the other side, and when we got out to the end I told Wichman I did not see Ferdinand. I said, 'I cannot see anybody,' and he gave the high-ball, and the train pulled out. * * * After we got in the shanty, we started out to look for Ferdinand. I found him. He was between No. 1 and the passenger track. No. 1 is the track upon which the switch local was standing. * * * When I first saw my brother, he was lying down with his head to the passenger track, to the south. His feet were to the north, to No. 1 track. I saw him lying there and pulled him back, so that his body was between the tracks, so I thought he would not get hurt any more."

The foreman testified:

"*Q.* What did you call the men who were working under you?

"*A.* My partner is the inspector, and the other we called—the one that got hurt was the oiler.

"*Q.* Both had to look over the air hose?

"*A.* Yes.

"*Q.* Before you let the train go, whose business is it to see that the oiler and inspector are out of the way?

"*A.* My business."

The foreman did not go over on the south side of the train at all before giving the signal. The point where Ferdinand lay was 25 or 30 car lengths east of the foreman's shanty, and a freight car is from 34 to 45 feet in length. The defendant put in testimony tending to show that soon after the accident Ferdinand's lantern and air hose were found, by an employé named Puhchili, some six car lengths east of the shanty, between tracks 6 and 7, some 80 or 90 feet north of track No. 1. The man who found the lantern and hose did not notice any blood or other marks at the place. The witness Miller testified that he saw Puhchili pick up the lantern and hose, and that near the spot there was a small spot of blood—

" On the corner of the rail, the outside corner. The spot of blood was not big. It was about two inches long, run down the edge of the rail. It was about half an inch wide. That is all the blood that I saw."

Another witness testified to having his attention called to the blood spot by Miller, and he testified that there was vomit there.

The testimony of Miller and Puhchili is in serious conflict. Miller testified:

"*Q.* Did you see him pick it up?

"*A.* Yes, sir.

"*Q.* Who picked up the lantern?

"*A.* Steve did. I saw him pick it up and take the things to the office. I was about six or seven feet from him. I came around the end of the car; he could not see me before. I came around the car, and he said, 'Just come here once.'"

Puhchili testified:

"*Q.* When you found this lantern and air hose, did you do anything or call anybody?

"*A.* No, sir; I did not call anybody.

"*Q.* Did you see anybody else there?

"*A.* Yes; Gus Miller was with me, carrying this lantern into the office. * * * I was going down on the south side of the train and came around to the air hose. Gus Miller was not with me when I found it. He was in the middle from my place to the office. He was between me and the office, and about the middle. I picked up the lantern and air hose and started for the shanty. Had gone two or three car lengths before I met Miller. Miller was pretty near to the switch point. He was talking to some one up there. I picked up the lantern and hose about three car lengths east of where I met Miller. I met him about the end of the train, by the switch point."

It is apparent that if Ferdinand was injured at the point where his lantern and hose were found, he must have dragged himself seven or eight hundred feet east therefrom to the place where he was found, a theory which the jury would be warranted in finding less probable than that, in the growing daylight, he did not need the lantern and left it and the hose, in order to hurry through with the belated performance of his duty. There was no error in submitting the facts to the jury in this regard.

(*b*) Wichman knew that Ferdinand understood that he was to go and help inspect the train as soon as lunch was finished, and that he had no other business on hand except that. He supposed that he was on the south side of the train when they started their inspection, and the natural expectation would be that, if not there, then he soon would be, in compliance with his orders; and whether he was justified in starting the train, without taking any steps to ascertain where Ferdinand was, we think was a question for the jury.

(*c*) This point was not made in the lower court, and therefore cannot be considered here. *Hayes* v. *Railroad Co.*, 163 Mich. 174 (128 N. W. 217, 31 L. R. A. [N. S.] 229).

2. The sixth assignment of error challenges the correctness of the following portion of the charge:

"Now, gentlemen of the jury, if you are satisfied by a preponderance of evidence that the defendant company was negligent in this regard, and that this injury was caused by the negligence of the defendant and its agent, you will render a verdict for damages, all damages resulting from the injury and death of the deceased. It is your duty to render the verdict which will comprise the reasonable amount for any pain and suffering endured from the time of the injury through his death, and, in addition, a reasonable amount for all sums that he would probably have earned during the years that he would probably have lived but for the injury, less such amount as he would, from the testimony you have heard, have spent upon himself for his own support. Your verdict will be for the sum of these two. Estimate the worth of his probable earnings at 5 per cent., and the sum of these for the several years that he would probably have lived will be the amount of your verdict for the loss alone."

Defendant's contention is as follows:

"The suit was brought under Act 104 of the Public Acts of 1909, entitled 'An act to prescribe the liability of common carrier railroad companies to their employés. It provides:

"'SECTION 1. Every common carrier railroad company in this State shall be liable to any of its employés, or, in case of his death, to his personal representatives for the benefit of his widow and children, if any; if none, then for his parents; if none, then for his next of kin, for all damages which may result from the negligence of any such railroad company or from the negligence of any of its officers, agents or employés, or by reason of any defect or insufficiency due to the negligence of any such common carrier or railroad company in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, coal docks or other equipment.'

"But for this act there is no liability, as the only negligence claimed is that of a fellow-servant. And the act prescribes liability, 'in case of death,' to his personal representative, 'for the benefit of his widow and children,' for 'all damages which may result,' etc. We respectfully submit that this act, which is the sole foundation of this action, does not contemplate a recovery for any pain or suffering endured by deceased before his death, nor for his probable future earnings, measured as under the sur-

vival act. The measure of recovery should be pecuniary loss of the beneficiaries."

The declaration alleges—

" That, by reason of his death, and the statutes in such case made and provided (section 10117, 3 Comp. Laws, and Act No. 104, Pub. Acts 1909), an action has accrued to this plaintiff, as his personal representative, to recover from the defendant the full value of damages sustained by said intestate, to wit," etc.

Act No. 104 of 1909 is entitled "An act to prescribe the liability of common carrier railroad companies to their employés." Section 1, above quoted, makes the companies liable "for all damages" resulting from their negligence. Section 6 provides that "nothing in this act shall be held to limit the duty of common carrier railroad companies, or impair the rights of their employés under existing laws of the State."

It was not the intention of the legislature, in our opinion, to repeal the survival act as to railroad employés, but to leave it in full force and effect.

3. The record shows that at the time the argument complained of was made no objection was made or ruling requested, but merely an exception taken. We have repeatedly held that we cannot review assignments of error based upon such a record. *Bates* v. *Kitchel*, 166 Mich. 695 (132 N. W. 459).

The judgment is affirmed.

MOORE, C. J., and STEERE, STONE, and OSTRANDER, JJ., concurred with BLAIR, J.

McALVAY, J. I think the verdict of the jury is a matter of pure speculation. *Scott* v. *Railroad Co.*, 169 Mich. 265 (135 N. W. 110).

BROOKE, J., concurred with McALVAY, J. BIRD, J., did not sit.