MEHEGAN v. BOYNE CITY, GAYLORD & ALPENA
RAILROAD CO.

1. CARRIERS — CONTRACT AGAINST NEGLIGENCE — RAILROADS — LI-
CENSE.
    The contract of a railroad corporation giving to em-
    ployees of another corporation license to operate a motor
    car on the railroad right of way, under certain restric-
    tions, and providing that the railroad should not be liable
    for negligence of its employees resulting in injury to
    persons so operating the motor car, is valid, because the
    contract was not made in the capacity of a carrier.

2. EXECUTORS AND ADMINISTRATORS—DEATH — LORD CAMPBELL'S
ACT—RELEASE—SATISFACTION—EFFECT ON ACTION BY PERSONAL
REPRESENTATIVES—ESTATES OF DECEDENTS.
    Under the death act, 3 Comp. Laws, § 10427 (5 How. Stat.
    [2d Ed.] § 13702), the personal representatives of a de-
    cedent are barred from recovering for injuries resulting
    in immediate death of a decedent, who, with his wife,
    the plaintiff, had executed a release of liability to the
    defendant for any injury that he might sustain while
    riding upon a motor car of his employer, operated over
    defendant's rails.

Error to Otsego; Sharpe, J. Submitted January
31, 1912. (Docket No. 119.) Decided May 28, 1913.
Reargued June 4, 1914. Opinion reaffirmed July 24,
1914.

Case by Lillian S. Mehegan as administratrix of
the estate of James E. Mehegan, deceased, against the
Boyne City, Gaylord & Alpena Railroad Company for
the unlawful killing of plaintiff's intestate. Judg-
ment for plaintiff. Defendant brings error. Re-
versed.

*Harris & Ruegsegger (Harrison Geer* and *H. R.
Martin,* of counsel), for appellant.

*DeVere Hall (George E. Nichols* and *H. A. Jersey,*
of counsel), for appellee.

MOORE, J.   The defendant is a railroad corporation organized under the laws of Michigan.   It owns and operates a railroad which extends from Boyne City to Gaylord, and has branches and spurs running from its main line.   Among other things, it transports timber products from the forests along its line of road to the mills and factories in Boyne City, and is what is generally called a logging railroad.

The Boyne City Chemical Company manufactures charcoal, wood alcohol, and by-products, and chars large quantities of wood each day, a large part of which is hauled over defendant's road from the forests along its line.

In July, 1905, the said Boyne City Chemical Company became the owner of a motor car which was propelled by gasoline.   The chemical company desired to use it upon the tracks of the defendant for the convenience of its men in going from its plant at Boyne City out along the line of the railroad for the purpose of measuring wood and performing other duties.   The chemical company and the defendant railroad company thereupon entered into an agreement which bears date July 6, 1905.   Under this agreement permits were issued to one William Spratt and the deceased, James Mehegan, to ride upon this motor car, which is designated in the agreement as "Number 99."

Mehegan and Spratt, before being permitted to ride upon the motor car upon the tracks of the defendant, were required, under the terms of the contract, to execute to the defendant a release; the plaintiff in this case joining with her husband in the execution of the same, and Mrs. Spratt, the wife of William Spratt, joining with him in the execution of said release.   Later, and about August, 1908, one Ralph Bearss also became a scaler for the Boyne City Chemical Company.   He executed a like release, and was granted a permit to ride upon and assist in operating

the said motor car upon the tracks of the defendant company. Under the terms of the agreement and after delivery of the release the deceased and Spratt, and later Bearss, continued from time to time to operate the motor car upon the tracks of the defendant company. In all train orders and train sheets, said car was known as "No. 99." Spratt, Bearss, and the deceased were men familiar with the railroad rules.

At a point east of the west line of Park street, which is the east line of the passenger depot in Boyne City, a house had been constructed for the housing of this motor car. It was situated about 20 feet north of the north rail of the main line of defendant's track, and stands partly upon a lot owned by the deceased, Mehegan, and from it extends a siding, which connects with the main line a few feet west of the west line of Boyne avenue, the distance from the motor car house to where the siding strikes the main line being approximately 195 feet. East of Boyne avenue, on the north side of the track, and 1,041 feet east of the motor car house, and 1,801 feet east of the depot, between the railroad tracks and the cooperage plant, are the steam vats of the cooperage plant, and east of the vats 739 feet is the telephone box on the south side of the railroad track, above mentioned. East of this telephone box a short distance is the side track connected with the main track, known as Mill No. 3 siding, sometimes called the Elm Cooperage siding, above mentioned. The steam vats are 65 feet long and lie almost parallel with the railroad track. In certain kinds of weather, with the wind in the north, northwest, or northeast, the steam from the vats along the track will at times settle down over the track so that it will obscure for perhaps 100 feet at times.

Many passenger and other trains arrive at and leave the station at Boyne City daily, going east and returning. Among others on February 19, 1909, was a regular passenger train scheduled to leave Boyne

City at 9:05 in the morning. That morning car No. 99 was in the motor car house east of the depot, and Mr. Bearss, Mr. Spratt, and plaintiff's decedent went to the motor car house for the purpose of taking the car to make a trip eastward on the tracks of the defendant. An order was obtained from the train dispatcher.

Previous to 9:05 a. m. on the morning of the 19th of February, a switch engine was working in the yard, and when the morning passenger train left the depot at 9:07 and when it passed the cooperage switch, this engine was standing on the siding just off the main line. Immediately after the passenger train passed, the conductor opened the switch on the main line, the engine ran out, the switch was closed, and the engine proceeded west on the main line toward the depot. The conductor did not call up the dispatcher and get permission to go out onto the main line before the engine ran out of the siding onto the main line. At this time the steam from the vats enveloped the track. No. 99, which left the motor siding switch on the main line at 9:10, was going east, following the passenger train. The steam obscured the view of the men on No. 99 of the track ahead of them, and it also obscured the view of the men on the switch engine of the track ahead of them, and No. 99 and the switch engine collided just as the switch engine emerged from the steam. Plaintiff's decedent was driving the motor car. He and Mr. Spratt occupied the front seats. Bearss, who was acting as switchman, and who had opened the switch for the car to pass out, and had closed it after the car passed out upon the main track, was standing up in the car in the rear of Mehegan and Spratt buttoning his coat. Spratt and Mehegan were both killed by the collision.

Plaintiff claims that the defendant was negligent, and that its negligence resulted in the death of her

decedent; that having established a telephone at the cooperage or mill 3 switch, and having issued a bulletin that the crews of engines working on that siding should call the dispatcher's office and receive orders to come out upon the main line over the switch to run to the depot before running upon the main line, it was negligence for the switching crew on this morning not to obtain such an order before coming out upon the main line, and that this negligence caused the death of plaintiff's decedent, and that the defendant is liable therefor.

The defendant contends that this collision occurred within its yard limit, and that plaintiff's decedent, who was operating the motor car, was operating it without regard to various rules of the company. The defendant further contends that even though its crew were negligent, and there was no negligence upon the part of the deceased and the others of the crew of the motor car No. 99, the plaintiff's decedent assumed the risk of operation of said motor car upon the defendant's tracks, whether the negligence which caused the accident was that of the defendant or themselves, under the contract between the chemical company and the defendant and the release executed by the plaintiff, Mrs. Mehegan, and her decedent.

At the close of the plaintiff's proofs, the defendant moved for a directed verdict in its favor. The trial judge overruled the motion. The defendant did not introduce any evidence and the case was submitted to the jury. It rendered a verdict in favor of the plaintiff for $12,000. The defendant made a motion for a new trial, which was overruled by the circuit judge. The case is here by writ of error.

The defendant discusses the following propositions:

1. The place where the accident occurred was within the defendant's yard limits; and rules 91 and 93 were not in any way modified or superseded by the bulletin claimed to have been issued relative to switch-

ing crews obtaining orders over the telephone before coming out of the cooperage or mill 3 siding onto the main track.

2. Plaintiff's decedent and his associates were guilty of contributory negligence.

3. The contract between the Boyne City Chemical Company and the defendant, the Boyne City, Gaylord & Alpena Railroad Company, was valid, and the release executed by the plaintiff's decedent, James E. Mehegan, and the plaintiff herself, who was his wife, is likewise valid, and this contract and this release preclude recovery in this suit.

4. The circuit judge should have granted the defendant's motion for a new trial.

In our view of the case it will be necessary to discuss only the third of the above propositions. The material parts of the contract to which reference has been made read as follows:

"Permit Granting Privilege by Boyne City, Gaylord & Alpena Railroad Company to the Boyne City Chemical Company to Operate a Motor Car upon Tracks of the Railroad Company.

"Whereas, the said Boyne City Chemical Company own a motor car, and in connection with its business it is necessary that its employees visit at different points upon and along the right of way of the said railroad company; therefore:

"The said railroad company hereby grant a permit to the said chemical company for itself and certain of its employees to use said car upon the tracks of the company, subject always to the conditions and regulations hereinafter set forth as follows:

"1. This permit shall be for employees of the Boyne City Chemical Company upon business only.

"2. The Boyne City Chemical Company shall furnish to the railroad company a list of its employees to be permitted by them to operate and ride upon this car.

"3. Such employees shall give to the railroad company a full release for all damages to themselves, their heirs and personal representatives which they

shall suffer by reason of the operation of this car, whether the same be caused by the negligence of the railroad company or its employees, or by their own negligence or the negligence of the chemical company.

"4. The chemical company shall release the railroad company from all claim of damage to said motor car caused by its operation or storage upon any of the railroad company's tracks and grounds, whether caused by the negligence of the railroad company's employees or otherwise.

"5. The chemical company shall execute a good and sufficient bond to the railroad company in the penalty of ten thousand dollars conditioned to reimburse the railroad company for all damages it may suffer arising to its property, its employees, to third persons and their property through the storage and operation of such motor car upon the tracks and grounds of the said railroad company.

"6. Said motor car shall have painted in large distinct figures upon front and rear of car, 'No. 99,' and shall be known and designated as 'No. 99' in all communications and train orders.

\*     \*     \*     \*     \*     \*

"8. Owing to the weight and bulk of said motor car it will be necessary to authorize its movements over the tracks of the railroad company by train orders in the same manner as extra railroad trains are now being operated by said railroad company; therefore it shall be the duty of the chemical company employees who are authorized to operate said motor car to first obtain and use a copy of the current time tables and rules governing the operation of the railroad company's trains.

\*     \*     \*     \*     \*     \*

"10. The rules and regulations governing the operation of the engines and trains of the railroad company shall apply, and the chemical company and its employees shall be bound by them in the same manner and to the same extent as the employees of the railroad company are thereby controlled and bound.

"11. The chemical company and its said employees before starting upon any trip with said motor car shall first obtain a train order for such trip from the train dispatcher of the railroad company then on duty, and shall conform to all laws and ordinances of the

State and municipalities relating to the operation of railroad trains as to speed, etc.

"12. The railroad company reserves the right to cancel this permit and to terminate the operation of said car upon its tracks without notice.

"Dated this 1st day of July, A. D. 1905.

"Boyne City Chemical Company, through its president and treasurer, hereby accepts the above permit, and agrees that said chemical company shall be bound thereby.

"Dated this 6th day of July, A. D. 1905."

The release heretofore referred to reads as follows:

"BOYNE CITY, MICH., July 15, 1905.

"In consideration of my being permitted to ride upon the motor car of the Boyne City Chemical Company upon the tracks of the Boyne City, Gaylord & Alpena Railroad Company, I hereby stipulate with the Boyne City, Gaylord & Alpena Railroad Company that I am in the employ of the Boyne City Chemical Company, and that I hereby release the said Boyne City, Gaylord & Alpena Railroad Company from any and all liability for any damage or injury which I may receive while riding upon or operating the said motor car of the Boyne City Chemical Company upon the tracks of the said railroad company, both as to any right of action that may accrue to myself, my heirs and personal representatives.

"I further stipulate and agree while operating or riding upon said motor car to be bound by all orders, rules and regulations of the said railroad company.

"W. T. SPRATT.
"MRS. WM. SPRATT.
"JAMES E. MEHEGAN.
"MRS. JAMES E. MEHEGAN.

"In presence of
"GLADYS SPRATT.
"MRS. WM. DOW."

It is the claim of plaintiff that the defendant had no right under the powers conferred upon it to enter into such a contract as was made here. No case is cited by counsel upon either side that is upon all fours, but there is a line of cases which establishes a principle which we think is applicable here.

Before calling attention to these cases a further statement of the situation disclosed by the record will be profitable.

The Boyne City Chemical Company carried on a manufacturing business at Boyne City. It uses large quantities of wood in its manufacturing business, about 5,000 cords a month which is shipped to its plant at Boyne City over the defendant's road. In connection with the cutting and shipping of this wood, it is necessary for certain employees to visit different points along the defendant's line of road for the purpose of buying wood, and measuring the wood, superintending the loading of it on cars, and looking after it in general in the woods. The employees who did this work at the time of the accident lived at Boyne City. Before the contract was made in July, 1905, these employees used to drive teams to and from their work. Frequently when they drove it took until nearly noon for them to get to their work, and sometimes they were away at camp two or three days at a time, and, in order that they might be at home more, it was decided to use the motor car. With it they were enabled to go to their work in the morning and get back at night, except when they went to Gaylord.

It will be seen that it was an advantage to all the parties to bring about the result which was attempted to be reached by the use of the motor car. The men were able to spend more time with their families at home. Less time was spent upon the road so that more effective work was done for the chemical company at the same wage, and more freight for the railway company would also result by the expenditure by the men of the same amount of time.

The record discloses that the use of their motor car by the chemical company, through its employees, upon the tracks of the defendant railroad company did not interfere with the performance by the defendant of its corporate duties to the public. It did

not lessen the number of trains or materially interfere with the freight or passenger traffic except possibly to increase the former, while at the same time the officers of the defendant road did not relinquish the right to control the movements of the motor car.

In *Coup* v. *Railway Co.,* 56 Mich. 111 (22 N. W. 215, 56 Am. Rep. 374), which was a suit for damages on account of injuries to a circus which had been carried under a special contract, it was held that the railway company was not a common carrier of circuses, and, therefore, that the contract which exempted it from liability was valid. Justice CAMPBELL, speaking for the court, said:

"Unless this undertaking was one entered into by the defendant as a common carrier, there is very little room for controversy. The price was shown to be only 10 per cent. of the rates charged for carriage, and the whole arrangement was peculiar. If it was not a contract of common carriage, we need not consider how far in that character contracts of exemption from liability may extend. In our view it was in no sense a common carrier's contract, if it involved any principle of the law of carriers at all.

"The business of common carriage, while it prevents any right to refuse the carriage of property such as is generally carried, implies, especially on railroads, that the business will be done on trains made up by the carrier and running on their own time. * * *

"It cannot be claimed on any legal principle that plaintiff could, as a matter of right, call upon defendant to move his trains under such circumstances and on such conditions, and if he could not, then he could only do so on such terms as defendant saw fit to accept. It was perfectly legal and proper, for the greatly reduced price, and with the risks and trouble arising out of moving peculiar cars and peculiar contents on special excursions and stoppages, to stipulate for exemption from responsibility for consequences which might follow from carelessness of their servants while in this special employment."

In *Clough* v. *Railway Co.*, 155 Fed. 81, 85 C. C. A. 1 (11 L. R. A. [N. S.] 446), it was said:

"That the railway company was under no common-law obligation to move the circus company over its line in the manner it was being transported at the time of the injury to the plaintiff in error must be conceded. If the railway company was under no statutory or common-law obligation to render the special service it was called upon to render there were no reasons of public policy which forbade the rendition of such service upon such terms as the parties might stipulate. The right to make special stipulation under such conditions has been recognized and applied in a number of cases substantially like the case at bar when circus trains were hauled under special agreements relieving the company from carrier's liability."

See same case in 212 U. S. 579 (29 Sup. Ct 688), also *Forepaugh* v. *Railroad Co.*, 128 Pa. 217 (18 Atl. 503, 5 L. R. A. 508, 15 Am. St. Rep. 672) ; *Robertson* v. *Railroad Co.*, 156 Mass. 525 (31 N. E. 650, 32 Am. St. Rep. 482) ; *Chicago, etc., R. Co.* v. *Wallace,* 66 Fed. 506, 14 C. C. A. 257 (30 L. R. A. 161) ; *Wilson* v. *Railroad Co.* (C. C.), 129 Fed. 774; and 1 Elliott on Railroads, § 451; *Cleveland, etc., R. Co.* v. *Henry,* 170 Ind. 94 (83 N. E. 710)—which indicate that special contracts exempting railroad companies from liability are valid.

There are many other cases cited to the same effect in the briefs of counsel for defendants.

It is said by counsel for plaintiff that the contract and release cannot take away the rights of Mrs. Mehegan and her child. In one of the briefs it is said:

"These sections (referring to the statute) give Mrs. Mehegan and the infant a right of action not possessed by decedent in his lifetime, but one arising from his death. As applied here, the right is one in no manner accruing to decedent as it did not begin

until his life terminated.   He could not release that which he never possessed."

In the other brief it is stated this way.

"It also may be conceded under the circumstances of this case, had deceased been injured, he could not have recovered from the railroad company.   Having released the company from all liability for injuries that might befall him through its negligence, he could not be allowed to recover from it in the face of this release.   The proposition is not admitted and the concession is only made for the purpose of the argument.

"The 'death act,' C. L. § 10427 (5 How. Stat. [2d Ed.] § 13702), provides that there can be recovery under the statute only when the party injured would have been entitled to recover, if death had not ensued. It might seem, upon first thought, that since Mehegan could not have recovered had he been injured, then of course there can be no recovery under the statute for his death, but this is not the logical conclusion when the statute appears in the full light of its true construction.

"The true construction of this statute must be that it was intended that the liability of the person or corporation causing the death of a deceased should be determined by the same state of facts and the same degree of evidence that would determine liability toward the deceased for any injuries he might have sustained.   If the company, under the facts, was liable to the injured had he lived, then, under the same state of facts it was liable to his wife and children for his death.   In other words, the statute, it seems to me, was intended to bar a recovery only when the state of facts applicable to the primary right of action was such as to bar recovery, and did not intend that the right the statute gave to a wife and her children, expressly and purposely for their maintenance, their pecuniary damage, should be defeated by any affirmative defense such as a release, or waiver, or compromise.   To follow such a construction would be to take from the wife and children the cloak thrown around them for their protection and place it upon the shoulders of the husband and father, to barter it away as he thought fit.

178 MICH.—45.

"The right given under the statute in no way inures to the benefit of the deceased; it is not even in existence, only as an inchoate right in the wife and children, until after his death; damages recovered under the statute belong not to his estate, but to those pecuniarily dependent upon him; he can have no pecuniary interest growing out of his own death; under no version of the statute has he even the remotest interest in any damages recovered for his death, and having no such interest, it follows that he cannot, by any manner of contract, defeat a recovery under the statute."

In view of these contentions so ingeniously and ably urged it is important to refer to the statute. It reads as follows:

"(10427.) Section 1. Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would (if death had not ensued) have entitled the party injured to maintain an action, and recover damages, in respect thereof, then and in every such case, the person who, or the corporation which would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

"(10428.) Sec. 2. Every such action shall be brought by, and in the names of, the personal representatives of such deceased person, and the amount recovered in every such action, shall be distributed to the persons and in the proportions provided by law in relation to the distribution of personal property left by persons dying intestate; and in every such action the jury may give such damages as they shall deem fair and just, with reference to the pecuniary injury resulting from such death, to those persons who may be entitled to such damages when recovered." (5 How. Stat. [2d Ed.] §§ 13702, 13703).

These provisions of the statute have been before this court several times. *Sweetland* v. *Railway Co.*, 117 Mich. 329 (75 N. W. 1066, 43 L. R. A. 568) ; *Dol-*

*son* v. *Railway Co.*, 128 Mich. 444 (87 N. W. 629) ; *Ingersoll* v. *Railway Co.*, 163 Mich. 268 (128 N. W. 227, 32 L. R. A. [N. S.] 362) ; *Verlinde* v. *Railroad Co.*, 165 Mich. 371 (130 N. W. 317) ; *Habitz* v. *Railroad Co.*, 170 Mich. 71 (135 N. W. 827). A reference to the opinions filed in those cases will show a great diversity of views on the part of the justices as to the construction the statute should have. It is however now established as the law in this State that the statute does not provide for two separate and distinct causes of action.

The following cases are instructive:

In *Brown* v. *Railway Co.*, 101 Tenn. 252 (47 N. W. 415, 70 Am. St. Rep. 666), it was held that an adjustment by deceased, in his lifetime, of his claim for damages for personal injuries barred an action by his widow to recover for his death resulting from such injury.

In *Southern Bell Telephone, etc., Co.* v. *Cassin*, 111 Ga. 575 (36 S. E. 881, 50 L. R. A. 694), the plaintiff's decedent had been injured through negligence of the telephone and telegraph company, and had instituted suit, and while the suit was pending had settled with the company and executed a release of his claim. Later he died, and his widow brought suit against the company, under the death act of Georgia, claiming that the release executed by him was not binding upon her. *Held,* that she was bound by the release, and that she could not maintain the suit. The court was composed of six judges, and two of them dissented from the majority opinion. The majority opinion contains a very exhaustive discussion of the authorities on the question. In the course of the majority opinion it is said:

"But it is said that no decision that a release by the husband bars a subsequent suit by or for the wife is of any value in this case, unless it was rendered by a court which holds that the survival and death

acts create new and distinct causes of action. This, therefore, must be borne in mind in estimating the weight of the authorities cited. In reading them, with this prominently in view, it is remarkable to note the various expressions used, in the effort to define the relation which the action by or for the widow bears to the action in favor of the injured husband. Some, in fact all of the courts, may be said to call it a new cause of action, as in *Western, etc., R. Co.* v. *Bass,* 104 Ga. 390 [30 S. E. 874]. Some call it a 'new, but not an independent cause of action.' Cooley on Torts, 264, speaks of it as an 'enlargement' or 'continuation.' * * * Others say 'the cause of action for the homicide is "contingent" on the death of the injured party without having satisfied his claim for damages.' But notwithstanding this variety of expressions, there is substantial unity in holding that a release by the husband bars the wife; this view being taken even by those courts which insist most strongly that the two acts create two causes of action, and by courts also which rule that concurrent suits may be maintained. However new it may be, in the very nature of things it cannot be independent; it is inherently rooted and grounded in the injury to the husband. It grows out of it, and is a part of it, having almost complete identity of substance, and subject to the same defenses. More than a dozen courts have directly passed upon the effect of a release by the husband, and all except those of Massachusetts and Kentucky have held that it bars a suit after his death."

After discussing the cases which it was claimed supported the right of the widow to maintain the action, the court, in majority opinion, said:

"We think the cases above cited are the very strongest which can be found in favor of the position taken by the defendant in error. It will be seen that they are based either upon penal statutes or upon decisions which have been overruled, or that they are discussing the effect of concurrent remedies after the death of the injured party, or that the decisions themselves have been weakened by conflicting decisions in the same jurisdictions."

It was further said in the majority opinion:

"If the wife is in privity with her husband, it is conceded that his settlement will bind her; but if there is no privity between them as to this class of cases, then if the husband should sue and fail to recover, the wife, after his death, would not be bound by that judgment; she may bring suit.and obtain a verdict, notwithstanding the husband failed in his suit. So that not only is a settlement no bar, but neither is a verdict against the husband a bar. This would not only make the statutes penal, but it would not allow the defendant to buy his peace by paying money, nor could he secure peace by making a successful defense immediately after the injury, when the recollection of the witnesses is fresh, when they are all accessible, and when the circumstances of the injury can be most certainly and truthfully portrayed."  *  *  *

"The settlement also operates as a bar upon considerations of public policy, interposing a statute of repose; for, if the settlement is not a bar, there is practically no statute of limitations, and oftentimes no person with whom the defendant can settle, and even after a settlement, marriage, birth of after-born children, death of the wife, minority of the children, and the possibility that the children themselves may die during the lifetime of the injured party, all make the defendant liable to an uncertain extent, as of an uncertain date, to unknown and unknowable persons. In the nature of things, one who claims as a wife is bound by the husband's conduct. His freedom from fault inures to her benefit, but his negligence is imputed to her, when, as a quasi-substituted plaintiff, she asks the court to investigate the circumstances of his killing. If his negligence in the act is imputed to her, should not also his conduct after the injury be imputed to her? In spite of all the recent statutes 'the husband is still the head of the family,' his life is his own, his body is his own, and whatever right in that life the law gives to his wife must be subject to the superior right of the husband. While the law gives her the full value of that life, she takes it as he left it. If it was a valuable life, in a pecuniary sense, —if his health, his strength, his habits, were such as

to give it a great earning capacity, then great is her recovery. But if, on the contrary, he had so lived as to lessen these elements of pecuniary value, if by idleness and vice and dissipation he had shorn himself of his strength, the wife's right therein must be taken burdened by what he has done in his lifetime. While he lives, his life and his person belong to himself, and he must use that life and body for the support of his family. He must be left free, when injured, to settle for the wrongs which were done to him, and to him alone; he must be at liberty to adjust that wrong without the amount of his settlement being diminished by the possibility, or probability, that the person dealing with him will have to pay a second time for the same act. The family stand to him in the relation of heirs, and, like all heirs, have no rights which can interfere with those of the living. They take what he leaves; they take under him and subject to him, and not adversely to him. Under this statute, the cause of action primarily grows out of the relation between the husband and the wrongdoer and his rights against the wrongdoer. The full value of action is in him; only secondarily is it in the wife, and it comes to her, if it comes at all, burdened and incumbered by his conduct, his settlement, and whatever else he did in his lifetime in reference thereto. It is true she may recover the full value of his life, but that value depends on what he was, and what he did in his lifetime, and if before his death he has settled with the defendant, he has, by his own act, transmuted the value of a cause of action into dollars and cents, and deprived his family of any further value growing out of the negligence complained of. * * * The contention of the defendants in error means that if a settlement takes place, the defendant may be called upon to pay a second time in case of death. It means double damages. It means the statute is to be treated as penal and not compensatory. It means that we are to lay at the door of our statute the reproach which was so often and so justly uttered against the statutes of some of the other States, as to which it was said that it was actually 'cheaper to kill than to hurt.' With us, hereafter, it would mean the same thing, because for the death of the husband there would only be one recovery. For

his injury and subsequent death there could be two
recoveries. We have seen that statutes identical with
ours in substance, having the same object in view,
and intended to give the same rights, have all, or very
nearly all, been construed to mean that where the
husband was injured and subsequently settled for the
injury, and thereafter died from the effect of the in-
jury, there could be no recovery by his wife for his
death. She stands in his shoes. She recovers if he
could have recovered. She fails if, for any reason,
he would have failed. If he consented to the injury
she cannot recover. If he ratifies the injury by ac-
cepting compensation, she cannot recover. If by
ordinary care he could have avoided the injury, she
cannot recover. If he obtains judgment against the
defendant, she cannot recover. What would have
estopped him estops her. Not only would it be a
hardship to require a defendant to pay double dam-
ages, but there are considerations of public policy
which cry out against such a construction—a public
policy so pronounced that it would require every rea-
sonable doubt to be resolved in its favor. If the de-
fendant is to pay the injured man full damages, and
subsequently is to pay the full value of his life, it be-
comes manifest that settlements are impossible. It
would operate to deprive the injured party 'of the
power of settling his claim, or realizing anything
from it in his lifetime. It would naturally, if not in-
evitably, prevent settlements, and procrastinate liti-
gation, until it could be determined whether death
would ensue from the injury. There could be little
inducement to settle without suit, because whatever
might be paid to the injured party would neither bar
nor diminish the claims of his representative, should
death ensue. The statutes should not be strained to
bring about such a result, nor should it be reached
unless required by the plain language of the enact-
ment.' Littlewood v. Mayor, 89 N. Y. 24 (42 Am.
Rep. 276, 277). Under such a construction the law,
by its own act, would encourage litigation, in spite of
the maxim that 'it is to the interest of the common-
wealth that there should be an end of litigation.' It
would make it impossible to obey the injunction,
'Agree with thine adversary quickly while thou art
in the way with him;' for the defendant can properly

ask, 'Who is mine adversary?' He might be willing to settle, he may have agreed on terms, and yet he would be compelled to say to a husband and father, 'It is impossible to say whether you will die as a result of these injuries or not, or whether, when you die, your wife and your children will then be living or not, or whether you will be wifeless and childless. She may consent to the settlement, but she may also die, and you may marry again. Or, the wife may die and leave you children. It is impossible to settle with them, because they are minors, and even if that were legally possible, there may be after-born children, and all of these uncertainties must be considered in our negotiations.' Surely the law does not intend that any case shall be so inchoate that the person liable does not know to whom he may be ultimately liable, and cannot adjust and settle, even when he admits liability and is willing to pay."

There are many other authorities cited in the brief of appellant to the same effect.

It is urged by counsel for plaintiff that *Ingersoll* v. *Railway Co.*, 163 Mich. 268 (128 N. W. 227, 32 L. R. A. [N. S.] 362), sustains their contention. A reference to the case will show that the effect of a release by the husband either before or after a cause of action would have otherwise arisen was not involved.

The language of the statute suggests very clearly that if the husband would not have a cause of action had he survived the injuries his widow and child would not have one. It is clear from the record that the chemical company, the defendant company, and the employees of the chemical company recognized that defendant company could not be compelled to permit the use of this motor car upon its tracks. It is also clear they thought it would be to their mutual advantage to permit its use. The defendant company was willing to enter into the arrangement if it could do so freed from all liability. To bring about the use of the motor the chemical company and the employees were willing to free the defendant company of liabil-

ity.  A reading of the contract and release shows that the parties thought they were accomplishing this result.  We can see nothing illegal or contrary to public policy in what the parties undertook to do.

The judgment is reversed.  No new trial will be granted.

STEERE, BROOKE, and STONE, JJ., concurred.

### ON REHEARING.

MOORE, J.  This case was originally heard in this court before five justices.  One of them, Justice BLAIR, died.  An opinion was handed down signed by the other four justices.  It is found *ante*, 694 (141 N. W. 905).  The case, upon the application of the plaintiff, was reheard, all of the justices sitting.  We think the result reached in the opinion which was handed down is right, and deem it unnecessary to write a further opinion.

The judgment of the court below is reversed.  No new trial will be granted.

MCALVAY, C. J., and BROOKE, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.