300 So.2d 378

**LOUISVILLE & NASHVILLE RAILROAD COMPANY, a corp.**

v.

**HARRIS TRANSFER COMPANY, a corp.**

**SC 312.**

Supreme Court of Alabama.

Sept. 12, 1974.

Lawrence B. Clark, Birmingham, for appellant.

William C. Wood, Jr., Birmingham, for appellee.

BLOODWORTH, Justice.

The facts and issues raised on this appeal are well stated in the dissenting opinion to which we refer the reader for an understanding thereof.

At the outset it should be noted that those who concur in the majority opinion agree with the dissenting opinion to the extent that we hold that all the assignments of error are related and that arguing them together does not preclude

consideration of one assignment, even though others may be without merit.

■ As to the merits, on this appeal, we affirm the trial court which held the railroad (L&N) is not entitled to indemnity from the industry (Harris Transfer) for the alleged injuries to the railroad's employee (under FELA) suffered as a result of being pinned between an oversized boxcar and the industry's building where the clearance between the building and centerline of the spur track was less than eight feet, the required clearance in the side-track agreement.

By the terms of paragraph 12 of the side-track agreement, the industry agreed it would not construct, place or permit structures within eight feet of the centerline of the track. At the place where the employee alleges to have been injured, the clearance is less than eight feet.

By the terms of paragraph 14 of the side-track agreement, the railroad assumed all ·liability for injuries to its employees unless the injury resulted directly or indirectly from the industry's breach of the provision in paragraph 12 concerning clearances.

Thus, the determinative issue is whether or not the industry breached its agreement not to construct, place, or permit any structure within eight feet of the centerline of the spur track.

The trial court found, inter alia, that the railroad itself built the side track with less than the required clearance between the centerline of the track and the warehouse which was constructed before the track was laid.

■ This Court has long been committed to the rule that when a chancellor hears evidence ore tenus (as the chancellor did here) his findings of fact have the weight of a jury verdict and will not be disturbed on appeal unless plainly erroneous or manifestly unjust and there is no credible evidence to support his findings. Morris v. Morris, 290 Ala. 41, 273 So.2d 203 (1973). We cannot say the chancellor's findings were plainly erroneous or manifestly unjust. To the contrary, these findings, in our judgment, are supported by credible evidence.

We consider that the following evidence supports the chancellor's findings:

(1) The letter of February 8, 1929, from the industry's attorney to the industry which contains a legal opinion concerning the "proposed contract" . . . which speaks of "force you to execute the agreement" . . . "compel the Railroad . . . to build and operate the spur track" . . . "terms of the contract must be agreed upon between you" . . . "it can agree to construct it" . . . all of which looks to the future execution of the contract. We think that the letter permits the inference that the contract had not been signed by February 8;

(2) The letter of February 13, 1929, from the railroad's assistant superintendent to the industry implies, according to our view, not that "the work of surveying, setting out stakes," etc. had already been done and that the contract had been executed, but rather that the railroad assistant superintendent had not yet commenced to do anything towards constructing the track, the physical fact at ·issue. The letter specifically states "advise when you desire this work started.";

(3) The ledger sheets clearly admit of the interpretation that the track was constructed subsequent to the building;

(4) The Internal Revenue Service Audit clearly implies that the track was constructed subsequent to the building since the federal government allowed only six months depreciation for the spur track but allowed seven and one-half months for the warehouse building;

(5) The direct testimony by witness Edwards who worked for the industry at that time and who testified in part, as follows:

"Q. Were you employed by the Harris Transfer Company at the time they moved into that building in 1929?

"A. Yes, sir.

"Q. Were you involved in the transfer of goods from the previous place of business of the Harris Transfer Company into the new warehouse?

"A. I was.

"Q. Was that sometime during the summer of 1929?

"A. We started moving the first part of June.

"Q. I see.

"THE COURT: 1929?

"THE WITNESS: Right.

"THE COURT: All right.

"Q. (By MR. WOOD:) Do you remember when the railroad siding behind that building was constructed relative to the date that you were moving in, or that Harris was moving in?

"A. It was while we were moving in.

"Q. Do you remember the construction of the railroad siding behind the building during the time that you were moving in?

"A. Yes, sir.

"Q. Is there anything in particular that points this fact out this many years ago in your mind?

"A. Well, most of them in here are not old enough to remember, but back in those days they had, the gang had one colored man who chanted a tune and the men worked in unison with his chant, and that just sticks in my mind. I don't think I will ever forget that.

"Q. I see. So, it is your testimony that *Harris Transfer Company building* which is adjacent to the spur track *was completed before the spur track* was constructed?

"A. *Yes, sir.*

"Q. And this is the building that is immediately adjacent to that spur track?

"A. Right."
     (Our emphasis.)

When one considers this direct testimony (which is uncontroverted), along with the other indirect testimony, it seems to us, one has to conclude there was credible evidence to support the trial judge's findings of fact.

It is thus that we must conclude to affirm the trial court.

Affirmed.

HEFLIN, C. J., and MERRILL, HARWOOD, MADDOX and JONES, JJ., concur.

COLEMAN, McCALL and FAULKNER, JJ., dissent.

COLEMAN, Justice (dissenting):

A party to a suit for declaratory relief appeals from an adverse decree declaring that appellant is not entitled to indemnity from appellee under a contract, and declaring further that appellant owes a duty to indemnify appellee.

Appellant is Louisville & Nashville Railroad Company, a corporation, and will be referred to as L & N.

Appellee is Harris Transfer Company, a corporation, and will be referred to as Harris.

On May 19, 1972, Harris filed its bill of complaint against L & N, and also Eddie Walton who has been served with citation of appeal but has filed no brief. Walton is indifferent to the issue of indemnity which is between Harris and L & N.

Harris avers that on, to wit, January 30, 1929, Harris executed with L & N a certain contract which is sometimes called a

side track agreement; that the agreement provided for the construction, operation, and use of a spur or side track on the premises of Harris' place of business in Birmingham. A copy of the agreement is made an exhibit to the bill.

Harris further avers that on October 1, 1971, Walton, an employee of L & N, filed suit against L & N for damages for personal injury resulting from an occurrence on September 17, 1971, in which Walton was struck by a boxcar on the premises of Harris; and that L & N has demanded that Harris defend, indemnify, and hold harmless L & N in said lawsuit by Walton, said demand being based on the provisions of the side track agreement.

Harris avers that L & N claims that the injuries of Walton were caused by a violation of Paragraph (12) of said agreement and that, under said agreement, Harris has a duty to indemnify L & N; but Harris denies that the allegations of Walton's complaint create any liability against Harris or set out facts showing a breach of Harris' duties under said Paragraph (12).

Harris avers that, under Paragraph (14) of the agreement, it appears that L & N is the only party liable to Walton.

Harris prays that the court declare that Harris owes no duty to indemnify L & N.

Subsequently, Harris amended its complaint by adding averments that on September 13, 1972, Walton filed suit against Harris for damages for Walton's injuries sustained as aforesaid. Harris amended its prayer by asking that the court also declare that L & N owes a duty to defend, indemnify, and hold harmless the complainant, Harris, in said suits by Walton.

L & N answered the bill and denied that Paragraph (14) of the agreement is controlling and says that Harris has the duty to defend, indemnify, and hold harmless L & N against the claim made by Walton.

The side track agreement designates L & N as first party and Harris as second party. Paragraphs (12) and (14) recite as follows:

"(12) Second party agrees that it will not construct any overhead structure lower than 22 feet above the top of the rail of said track, or any structure within eight feet from center line of said track, and that it will not place or permit any structures or obstructions, of either a permanent or temporary nature, on said track, or within the limits of the horizontal and vertical clearances above provided; *and further agrees that it will indemnify and save harmless the first party against and from any and all claims for loss of or damage to property or injury to person caused directly or indirectly by the existence, location or condition of any structures or obstructions of any kind on the premises of second party, or by any structures or obstructions, of either a permanent or temporary nature,* on said track, or *within the limits of the clearances above provided. Knowledge of* or notice to *the first party of the existence,* location or condition *of any structures* or obstructions *of any kind on the premises of the second party,* and its continued operation of the track thereafter, *shall not be a waiver of this covenant."* (Emphasis Supplied)

"(14) The second party also agrees to indemnify and hold harmless first party against loss, damage, or injury from any act or omission of second party, its employees, or agents, to the person or property of the parties hereto and their employees, and to the person or property of any other person or corporation, while on or about said track; and if any claim or liability shall arise from the joint or concurring act or omission of both parties hereto, their employees or agents, each party shall assume all liability for and indemnify the other party against loss, damage or injury to its own employees and to its own property and the property of others in its care or custody, and liability for loss, damage or injury not herein provided for shall be borne by

the parties equally. *Provided, that nothing in this section contained is intended to or shall relieve second party of the obligations of release and indemnity contained in Sections 11 and 12.*" (Emphasis Supplied)

The parties stipulated as follows:

"MR. CLARK: The Complainant, Harris Transfer Company and Respondent, Louisville & Nashville Railroad Company, a corporation, make the following stipulations of facts:

"Number One. The Respondent, Eddie Walton is an L & N employee and was at all times relevant to this action.

"Number Two. Eddie Walton claims injuries for an accident which occurred on, to-wit, September 17, 1971 at the spur track behind Harris Transfer Company.

"Number Three. The spur track involved was built by L & N pursuant to the side track agreement attached as Exhibit A of Complainant's Bill.

"Number Four. Eddie Walton has filed suit against L & N Railroad, Case Number 32930, claiming injuries under the Federal Employees' Liability Act.

"Number Five. Eddie Walton has filed suit against Harris Transfer Company, Case Number 37547, claiming injuries resulting from the alleged negligence of Harris Transfer Company.

"Number Six. Both case 32930 and 37547 are involved in this declaratory judgment action.

"Number Seven. The place where Eddie Walton claims to have been injured by being pinned between a railroad car and the Transfer Company building is a point between the distance where the center line of the spur track and the building is less than eight (8) feet."

After a hearing ore tenus, the court rendered a decree holding that Harris owes no duty to indemnify L & N for the claim of Walton against L & N, and that L & N owes a duty to indemnify Harris from any loss arising from the claim of Walton.

The court noted "that L & N's obligation in this regard is contingent in that its obligation is only to pay any judgment which may be entered in said lawsuit against Harris. L & N has no duty to defend the lawsuit against Harris, but Harris has no obligation to offer a defense in its own behalf."

The court's decree makes findings as follows:

"The Court finds the following facts:

"1. The side track agreement was not executed until sometime after January 30, 1929; the evidence indicates that it was signed about February 12, 1929, and that construction on the Harris Warehouse had begun by the date of execution.

"2. L & N unilaterally increased the risk of injury to persons on or near the track beyond the degree contemplated in the side track agreement in that:

"a. L & N built the side track involved in this action with less than eight feet between the center line of the track and the warehouse which was constructed before the track was laid.

"b. L & N built a stone and wood retaining wall sometime after the track was completed and before Walton was injured beside the track involved on the side opposite the Harris warehouse with only the same clearance between the wall and the track as existed between the building and the track.

"c. Walton was hit by an abnormally wide boxcar placed on the track by L & N without notice to him.

"3. No negligence has been shown on the part of Harris. It should be noted that although these findings of fact are conclusive in this cause, they are to be

of no effect if and when the lawsuits filed by Walton against L & N and Harris are tried.

"It is readily apparent that Harris has not breached any duty owed by it to the railroad under the terms of the side track agreement. Harris has not constructed, placed, or permitted any structure within the limits specified in paragraph twelve. Rather, L & N itself has caused the Harris warehouse to be located within the agreed limitation. Since the railroad has caused the warehouse to be too close to the track by laying the track too close to the building, it should not now complain of this situation, seeking indemnification for its breach of a non-delegable duty.

"Paragraph 14 very specifically deals with the situation created by Walton's suit against Harris and establishes L & N's obligation to indemnify Harris and hold it harmless."

By his deposition, Walton testified that he was employed by L & N as a switchman; that the accident occurred at 6:00 a. m.; that it was dark and raining; he carried a lantern; that he operated the switch to let the train in the "cross-over and line it back when he gets through"; that the train was going in to leave one car and pick up two; that all three cars were connected at the time of injury; they had two 40-foot boxes and a 50-foot box; the 50-foot box was in the middle; the 50-foot car is wider than the 40-foot car, he guesses "about a foot, a foot and a half, something like that"; that is "a foot on each side of the car"; there was about a foot and a half of water standing there; he had trouble walking in the water; he had made the coupling; the train was moving very slowly, 3 or 4 miles an hour, to stretch the coupling; Walton was walking along with it shining his light on the rail; he was walking watching the wheels, and the wide boxcar "hit me and turned me around" and "rolled me up in between the building and the wall," "The building and the car."

L & N's argument is divided into two parts. The first part is in support of Assignment 12 wherein L & N asserts that the court erred in declaring that L & N owes a duty to indemnify Harris and that Harris owes no duty to indemnify L & N. By reference, L & N directs the same argument against seven other assignments.

The second part of L & N's argument is in support of Assignment 15 wherein L & N asserts that the court erred in finding that L & N had unilaterally increased the risk of injury by constructing the track where it did. By reference, L & N directs the same argument against seven other assignments.

Harris asserts in brief that appellant's brief contains argument specifically addressed to two assignments of error, 12 and 15; that appellant has tacked on a concluding paragraph to each division of the argument attempting to assign the argument presented to each individual assignment made by appellant; that this constitutes a grouping of assignments for the purpose of argument; and that ". . . Alabama law is clear that where several assignments of error are grouped and argued together in brief and one is found to be without merit the Court will not consider the others." Harris cites Supreme Court Rule 9 and certain authorities.

Harris asserts that Assignments 1 and 2 are not sufficiently precise to be considered on appeal and that the other assignments to which the first part of appellant's argument is directed are due to be disregarded because they are grouped together with Assignments 1 and 2 for the purpose of argument; citing, inter alia, Burroughs v. Booth, 286 Ala. 110, 237 So.2d 496, and Purvis v. Ennis, 258 Ala. 174, 61 So.2d 451.

Assignments 1 and 2 are to effect that the court erred in rendering the final de-

cree and in rendering the final decree in favor of Harris and against L & N.

The single issue in this case is which party, Harris or L & N, is bound to assume liability for Walton's injury and indemnify the other party. Under the rule in Robinson v. Murphy, 69 Ala. 543; Murphy v. Pickle, 264 Ala. 362, 87 So.2d 844; and Wiggins v. Stapleton Baptist Church, 282 Ala. 255, 210 So.2d 814, it may be argued that Assignments 1 and 2 are sufficiently precise.

In any event, all the assignments are related, and the rule against grouping assignments for argument, on which appellee Harris relies, applies only when the assignments argued in bulk are not all related. This writer has had occasion heretofore to acknowledge this rule as follows:

"The instant writer, as well as others, has been guilty of stating the rule as relied on by appellee Smith. Bertolla v. Kaiser, 267 Ala. 435, 440, 103 So.2d 736. The rule, that we consider no assignments when several are argued together and one is without merit, applies only when they are not kindred or related. Southern Electric Generating Company v. Lance, 269 Ala. 25, 33, 110 So.2d 627. Where several assignments are governed by the same legal principles and argument, it is not objectionable to argue them in bulk in the brief. Socier v. Woodard, 264 Ala. 514, 518, 88 So.2d 783." Bryan v. W. T. Smith Lumber Co., 278 Ala. 538, 542, 179 So.2d 287, 290.

More recently, this court has said:

"However, the rule is that if assignments argued in bulk are so related as to present a single question, it is proper to group them for argument, and even if one of the assignments be not well taken, review of the other assignments will not be pretermitted. Boohaker v. Trott, 274 Ala. 12, 145 So.2d 179. . . ." Allison v. Acton-Etheridge Coal Co., Inc., 289 Ala. 443, 445, 268 So.2d 725, 727.

Appellee argues that appellant's argument should not be considered because it is directed to the support of assignments which are not due to be considered because they do not refer to any ruling of the trial court, citing Stone v. Personnel Board of Jefferson County, 290 Ala. 229, 275 So.2d 659; All American Life & Casualty Co. v. Dillard, 287 Ala. 673, 255 So.2d 17; and McCullar v. Conner, 287 Ala. 455, 252 So. 2d 422.

In this argument, appellee asserts that Assignment 10 is faulty in that it does not refer to any ruling of the trial court. Assignment 10 recites that the court erred in making the following statement in the decree:

"Paragraph 14 [of the side track agreement] very specifically deals with the situation created by Walton's suit against Harris and establishes L&N's obligation to indemnity Harris and hold it harmless."

In the statement from the decree which is quoted in Assignment 10, the court construes the side track agreement and holds that Paragraph 14 requires L & N to indemnify Harris. The assignment not only refers to the decree but also quotes from it and sets out the ruling complained of in the language used by the court. There is no merit in appellee's argument that the assignment does not refer to a ruling of the court.

The assignments to which the argument is directed are all related in that they are governed by the same legal principles and argument, and arguing them together does not preclude consideration of one assignment even though others may be imperfect or without merit.

Appellee says in brief:

". . . The entire record supports the Court's finding that Walton's injury was a proximate result of L & N negligently constructing the track closer to the Harris warehouse than the standards

which L & N undertook to establish in the side track agreement. . . ."

The evidence to support the finding that L & N negligently constructed the track will be considered in detail.

The evidence tends to show that in the early months of 1929, Harris desired to build a warehouse and to have a side track built on Harris' premises to serve the movement of articles from warehouse to train and vice versa. The precise dimensions of the warehouse are not shown. A scale drawing which is in evidence shows that the wall of the warehouse which faces the track is more than four hundred feet long. Roughly described, the warehouse is south of the track. The wall and the track are both arched or curved. The center of the arc, or of the circle of which the arc appears to be a part, lies south of the wall. In the warehouse wall there are seven doors which provide access from warehouse to track.

Harris and L & N entered into the written contract dated January 30, 1929. A drawing of the side track appears on the agreement. As noted above, the court found that the agreement was signed "about February 12, 1929" and that construction of the warehouse had begun "by the date of execution."

There is no averment in the pleading with respect to the time when the contract was signed or that it was not signed on the day of its date. Over objection of L & N, evidence was admitted tending to show that the contract was not signed on the date it bears.

There is no direct evidence showing the day or date on which construction of warehouse or side track actually began. As hereafter noted, over L & N's objection, Harris introduced evidence which was intended to furnish an inference as to when the work was done on the warehouse and the track.

The evidence supports an inference that construction of the side track and warehouse were begun in early 1929 and finished in the latter part of that year.

The court found that Harris ". . . has not constructed, placed, or permitted any structure within the limits specified in paragraph twelve. Rather, L & N itself has caused the Harris warehouse to be located within the agreed limitation. . . ." L & N contends that said finding is not supported by the evidence. Harris contends to the contrary. The evidence to support the finding of the court is next considered.

Harris' Exhibit 1 is a letter from an attorney to Harris dated February 8, 1929. The letter commences:

"We return herewith proposed contract between yourselves and the Louisville & Nashville Railroad Company.

"In answer to the inquiry contained in your letter of February 1st concerning paragraph numbered 13 of the contract, our opinion is as follows: . . ."

Harris says the letter shows that Harris had not executed the contract on February 8, 1929.

The letter also shows that Harris had written a letter on February 1st inquiring about the provisions of the contract. The reasonable inference follows that the contract had been prepared and was in the possession of Harris on or before February 1st.

Harris' Exhibit 2 is a letter dated February 13, 1929, from L & N's Assistant Superintendent in Birmingham to Harris. The text of the letter recites:

"I have instructions to lay a track for you at or near Twelfth Street, Birmingham, as soon as you are ready for it. Please advise when you desire this work started."

Harris says the letter shows that ". . . L & N had not, as of that date, begun any work on the spur track . . ."

In the light of evidence hereinafter noted, the letter can hardly be said to show that L & N had not begun "any work." The Assistant Superintendent says he has been instructed to lay the track as soon as Harris is ready. The letter implies that the work of surveying, setting out stakes, and preparing the side track agreement had been done; that the contract had been executed by both parties, and had been approved by the Assistant Superintendent's superiors who instructed him to lay the track "as soon as" Harris was ready.

Harris' Exhibit 3 is a letter from Harris to L & N dated December 10, 1934, which recites:

"We have misplaced our copy of the Contract in connection with our private siding, the original of which was executed and turned over to the L & N Railroad in February 1929.

"We will appreciate your furnishing us with a duplicate copy of this Contract at your earliest convenience."

Harris says the letter shows that the agreement was not executed until sometime in February, 1929. It shows nothing as to whether L & N was negligent. It does show that Harris had lost its copy of the contract and requested another copy.

Harris' Exhibits 4 and 5 are two ledger sheets. The words "HARRIS TRANSFER & WAREHOUSE COMPANY" are printed at the top of the page on both sides of both ledger sheets.

The following words are written near the top of the page on Exhibit 4, to wit: "New Building A/C Special." On Exhibit 5, the following words are written: "Special Ledger A/C Building Fund." The figures "1929" are stamped or typed at the top of the "DATE" column on both exhibits. It is thus indicated that the date of all entries is in the year 1929.

Harris says on page 5 of brief that Exhibits 4 and 5 are "ledger sheets of Harris which show that no payments were made by Harris for the sidetrack until after payments had been made for the construction of the Harris warehouse."

On pages 22 and 23 of brief, Harris says: ". . . The debit entry on Exhibit 4 indicates that Harris did not deposit funds with the L & N to cover the costs of material until February 12 (T. 37). . . ."

The first debit entry on Exhibit 4 is dated "Feb 12"; is to "L & N Ry Co" in amount 1350.00," which appears to indicate dollars; and is the only debit entry charged to "L & N Ry Co" which appears on either Exhibit 4 or 5. "Feb 12" is the earliest date shown on any entry, debit or credit, on either Exhibit 4 or 5. All other entries on both exhibits are dated "Mch," or some month subsequent to March.

In brief, page 23, Harris says:

". . . The fourth debit entry on Exhibit 5 indicates that the cross-ties which Harris was required to furnish under the terms of the side track agreement were not purchased until March 20, 1929 (T. 38). Exhibit 5 shows the dates payments were made to Charles M. Allen & Son, the contractor who constructed the Harris warehouse, inferring that some work had been completed on the warehouse on the dates that drafts were issued (T. 38). . . ."

If, as Harris says, the fourth debit entry on Exhibit 5 shows that the cross-ties were not purchased until the date of the fourth entry, which is March 20, 1929, then it must follow that the items shown in subsequent debit entries were not purchased until the respective dates of the subsequent debit entries.

Each entry is on one line. The month is written on the first entry. The month is not repeated or shown on subsequent entries until a new, subsequent month is entered. The month of the first five entries

is "Mch," which appears to indicate March. The month of the sixth entry is "Apr."

The first four debit entries on Exhibit 5 recite as follows:

| "Mch | 9 | C M Allen & Son | | Ck # 000 | 1351.06" |
| " | | Harris Tsfr Co LN RR track | | V 001 | 1350.00" |
| " | 20 | Chas M Allen & Son | | V 002 | 3561.30" |
| " | V | Frt on 2 cross ties | | V 003 | 52.01" |

------

As stated above, the first debit entry on Exhibit 4 is to "L & N Ry Co," dated "Feb 12," for "1350.00." If the date of the debit entry shows the date an item was purchased, the track was purchased February 12, prior to any debit entry to C. M. Allen & Son.

Exhibit 5 contains at least eight subsequent debit entries to "Chas M Allen & Son" and four subsequent entries to "C M Allen & Son"; and one or more of said subsequent debit entries is in each of the months of April, May, June, July, August, and September. There appears in September a debit entry as follows:

| " | 14 | C M Allen & Son Final whse | | 056 | 863.28" |

Exhibit 5 also contains more than fifteen credit entries. One of them recites as follows:

| "Aug | 7 | Rfd L&N Excess Pd on Track | | | 238.76" |

------

If the dates of the entries on Exhibits 4 and 5 support any inference as to when work was done on the warehouse and track, the inference must be that work on the track began before work on the warehouse began, and the track was completed before the warehouse was completed. The two exhibits do not tend to show that L & N did not lay the track at the place designated by Harris.

Harris offered in evidence a copy of an audit made by the Internal Revenue Service in 1932, which appears to cover the year 1929. Harris contends that the audit allows depreciation for five-eighths of a year on the warehouse and four-eighths of a year on the side track. The allowance of depreciation as Harris contends, however, sheds no light on the issue of negligence in construction of the track.

Harris called the witness Edwards who started to work for Harris "July the 9th, 1926," and worked for Harris forty-one years. Edwards testified that Harris started moving into the warehouse in June, 1929.

The witness Smiles testified that he has been employed by Harris since 1923, that the warehouse and track were "put in sometime in 1929"; that other railroad tracks immediately to the north of the spur track were on the same level as the spur track; they had been raised but "everything was level, the spur track and the main lines of the Southern and L & N were all level with the road"; those tracks are now raised to a higher elevation at this time; there is an overpass at 14th Street one block away from the Harris building where 14th Street traffic can go under the railroad tracks; there is a bank to the north of the spur track and Walton contended that he could not work to the north of the track.

The witness Holland testified that he is employed by L & N as assistant engineer of the Birmingham Division, that he made certain measurements about the warehouse

and track, and he had prepared a drawing showing measurements to scale which is respondent's Exhibit 1.

He testified that, at the point which had been identified to him as the place where Walton was injured, the building was 7 feet 3⅝ inches from the center of the track, and the distance from the center of the track to retaining wall on opposite side of track was 7 feet 6 inches.

The drawing on the 1929 contract does not show the location of any building. He testified:

"A. These contracts were prepared by the assistant engineer at that time on the railroad, and the practice then was as now, if the location of a building to be served was known, it was shown on the drawing, and if it wasn't known, well, it wasn't shown." He testified further:

"Q. (BY MR. WOOD:) Have you seen drawings that were made up back in the period of time we are talking about, 1929?

"A. Yes. The example on this contract is an example of it.
" . . .

"Q. Well, sir, those working drawings are what a train crew uses that puts that track in, aren't they?

"A. No. They go by the stake set by the engineer.

"Q. Go by the stakes set by the engineer?

"A. That's right.

"Q. What does the engineer use to set those stakes out?

"A. Well, you make a survey.

"Q. You have a surveyor go out with a transit, and drive stakes?

"A. That's right, and keeps notes of that in the engineer's notebook.

"Q. Well—

"A. You may or may not plot them up on a drawing when you get in.

"Q. What does the engineer use to survey and tell the surveyor what line to survey? Does he use that working drawing?

"A. No. You have to make the survey before you can make the drawing.

"Q. I say, you make the working drawing from the survey?

"A. That's right.

"Q. When is the side track agreement document drawn up?

"A. It is drawn up between the time of the original survey and the time that the contract is prepared.

"Q. Well, you say between the time— you say the side track agreement is drawn up between some other time and the time the contract is prepared. What contract are you referring to?

"A. The particular contract covering the job in question.

" . . .

"Q. Well, this document—the side track agreements are contracts, aren't they?

"A. Right.

"Q. When are these documents drawn up?

"A. The engineer that they had here on this job at this time, he went out and staked this track out to serve a location indicated to him by this industry that that is where they wanted a track.

"Q. All right, sir. Now, my question is, is this document drawn up before or after the survey?

"A. It has to be drawn up after, because you see the information on here would not have been known before—

" . . .

"Q. (BY MR. WOOD:) Is this document drawn up after the survey?

"A. Yes, it is.

"MR. CLARK: By that document, you mean the lease agreement?

"MR. WOOD: I am referring to the side track agreement.

"MR. CLARK: Side track agreement.

"Q. (BY MR. WOOD:) Are the side track agreements drawn after the working drawings?

"A. They are usually drawn up at the same time.

"Q. At the same time?

"A. Yes.

"Q. Well, sir, the side track agreements aren't nearly as detailed as working drawings, are they? They couldn't be if they are not as big?

"A. Well, right. Although, on many occasions no working drawing is actually ever made.

" . . .

"Q. (BY MR. WOOD:) It wouldn't make any difference whether or not the building is shown on that side track agreement drawing, would it?

"MR. CLARK: We would object to that, Your Honor. That is—

"THE WITNESS: Good engineering practice would dictate that it be put there, and the distance between the track and the building shown.

"THE COURT: Overruled.

"Q. (BY MR. WOOD:) And the distance between the track and the building shown?

"A. That's right.

" . . .

"Q. (BY MR. CLARK:) Just briefly, Mr. Holland, let's get the procedure down in its order. When an industry requests a track, or spur track, talking about custom and practice then and now, what is the first thing that is done, please, sir?

"A. The engineering department goes out and contracts (sic) this industry, and the industry shows them where they desire to have a track built.

"Q. All right.

"A. Then, our job is to stake out a track at that point.

"Q. You stake it out actually on the ground?

"A. On the ground at the point where they indicate they want the track.

"Q. What do you do when you stake it out, do you run some sort of survey?

"A. Yes. We run the center line of the track in setting the stake every 50 feet on the ground.

"Q. And that stake represents the center line of the track?

"A. That's right.

"Q. I presume a track is a standard distance between the tracks, is it?

"A. Yes, it is.

"Q. And after you run the survey, and stake the center line of the track, then do you make drawings?

"A. We then prepare the drawings for the contract, and in some cases where the layout is complicated, a working drawing to build it by, as he indicated.

"Q. All right, sir. If a building is in existence, is it custom and practice of the railroad to indicate the building?

"A. That's right. Of course, that would be the key to the layout.

"Q. Even if it is on a no-scale drawing?

"A. Yes, sir.

"Q. And if it is on a no-scale drawing would you indicate the distance from the building at various points to the track?
" . . .

"A. Yes, we would show the distance to the building, and specifically, if it was less than standard we would show it.

"Q. And is this less than standard?

"A. Yes, sir.

"Q. The one we are dealing with here?

"A. Yes, it is.

"Q. So, even if it was not a scaled drawing, the distance would be figured in there from the track, or the proposed track to the building on a figure, or as a figure basis, right?

"A. Shown as dimension on the drawing, yes, sir."

The testimony of Holland showing the procedure followed in making the survey, preparing the side track agreement, and constructing the side track is not contradicted. The testimony shows that if the building were in existence, the practice would be to show it on the drawing on the contract. A finding that the building was in existence at the time the survey was made and the stakes set at the place indicated by the industry must rest on speculation or conjecture. Such a finding must disregard the undisputed testimony and does not rest on the evidence. The finding that L & N negligently constructed the track so that the center line of the track was within eight feet of the building is not supported by the evidence.

The trial court found that Paragraph (14) of the contract deals with the situation and establishes L & N's obligation to indemnify Harris. In this finding the court erred. The injury to Walton was caused directly or indirectly by a structure within the limits of the clearances specified in Paragraph (12) of the contract. The right to indemnity rests on the provisions of Paragraph (12). To hold that Paragraph (14) applies to the right to indemnity requires that the last sentence of Paragraph (14) be ignored and held for naught. The parties explicitly agreed to the provisions: "Provided, that nothing in this section contained is intended to or shall relieve second party of the obligations of release and indemnity contained in Sections 11 and 12."

Under the provisions of Paragraph (12), the negligence of the parties is not material. On an appeal by an industry from a judgment requiring that the industry indemnify the railroad under a side track agreement, The Court of Appeals of Kentucky affirmed. The following are excerpts from the opinion:

"The position of appellant is not sound. First, the obligation undertaken by appellant in this contract, so far as here pertinent, is not predicated on any negligence on its part. The appellee's cause of action arises ex contractu and not ex delicto, and the respective rights and duties of the parties as well as their liabilities are governed solely by the terms of the contract they made. The obligation to keep the tracks free from obstruction, and to hold the appellee harmless from any claims on account of any failure on appellant's part to so keep the tracks, is an absolute one. Appellant might have made it a condition of liability that it should be guilty of some negligence, but this it did not do. It was free to make any contract it chose so long as it was not against public policy, and, having chosen to undertake an absolute liability rather than a qualified one, it cannot now be heard to complain of the choice it made. . . .

" . . .

" . . . The obligation imposed upon appellee was not exorted (sic) from it as a condition to the performance by appellant of any of its common-law duties. It was freely undertaken for the agreement by appellee to do something it was not required to do. The contract was not one of exemption from appellee's common-law liability for negligence. It was only a contract of indemnity for such liability. Such contracts contravene no settled policy of this state. Quite the contrary. Casualty insurance companies are authorized by law to do business in this state. Employers who are by the Workmen's Compensation Act (Ky.St. §§ 4880–4987), required to pay

to their employees the compensation therein prescribed are not only permitted, but are in most instances required, to insure themselves against this obligation. Most automobile owners insure themselves against claims which may be asserted against them even for their own negligence. . . ." John P. Gorman Coal Co. v. Louisville & N. R. Co., 213 Ky. 551, 281 S.W. 487, 488, 489.

In Miller and Company of Birmingham v. Louisville & N. R. Co., 328 F.2d 73, the court considered a side track agreement which is identical in all material respects with the agreement in the instant case. The court affirmed a judgment requiring the industry to indemnify the railroad. Among other things the court said:

"Moreover, the final proviso in Paragraph 14 is a clear recognition by the parties that the industry's obligation of indemnity contained in Paragraph 12 is broader than its promises in Paragraph 14, and covers other claims or liabilities as well. We conclude that the industry's indemnity embraced claims based on the railroad's negligence.

"It had seemed to us that if the contract to indemnify the railroad does not embrace claims based on the railroad's negligence it had no meaning. In a supplemental brief, appellant's able counsel sought to refute that view. While the resourcefulness of counsel is admirable, their refutation appears to us strained and our view remains unchanged insofar as concerns any field of operation of the contract which would ordinarily be in the minds of the parties.

"The industry did not plead as an affirmative defense that the indemnity agreement is an illegal contract, but it does urge that the public policy of the State does not permit a construction which would indemnify a common carrier for its own negligent conduct. As noted, however, in a valuable annotation in 175 A.L.R. at p. 102, ' * * * the

service afforded the shipper by such additional facilities for the special handling of his freight is not required of the railroad under its duties to the public as a carrier, so that it may attach such conditions as it sees fit in giving its consent to furnish the particular service, including a provision for exemption from liability for loss through its own negligence.' . . .

"The stipulated facts do not connect the railroad's negligence with its duties as a common carrier, or even show that the railroad is a common carrier, though we take judicial notice that it is. Here, however, the railroad was contracting for a service not required of it as a common carrier. See Chicago & N. W. Ry. Co. v. Davenport, 5 Cir., 1953, 205 F.2d 589, 594, 595.

"It makes no difference that an Alabama statute may impose a duty on the railroad to construct and maintain spur tracks to existing industries. The Alabama Public Service Commission has adopted no general rules to implement that statute, nor has it prohibited the kind of indemnity contract here agreed on. In Sunlight Carbon Co. v. St. Louis & S. F. R. Co., 8 Cir. 1926, 15 F.2d 802, 805, it was said: ' * * * on principle we perceive no reason why a railroad company may not, when acting in its private capacity, relieve itself from an absolute liability imposed by statute as well as from liability resulting from negligence.' The spur track in this case was constructed and maintained not under the mandate of this statute but pursuant to the agreement between the industry and the railroad." (328 F.2d at 77, 78)

I would reverse the judgment appealed from and remand the cause with directions that a judgment be entered declaring that Harris is obligated to indemnify L & N for its liability to Walton.

McCALL and FAULKNER, JJ., concur.