THOMPSON, Presiding Judge.
B.H., on behalf of E.D.E. (“the child”), and G.W. separately appeal a judgment of the Montgomery Juvenile Court (“the ju *566 venile court”) that awarded custody of the child to R.E., Jr. (“R.E”).
Shortly after the child’s birth in May 2005, the child’s mother, K.D.H. (“the child’s mother”), died of complications from childbirth. A few days later, on May 18, 2005, R.E. filed a dependency complaint in the juvenile court in which he alleged that he was the child’s father and in which he sought custody of the child. The juvenile court appointed a guardian ad litem, B.H. (“the guardian ad litem”), to represent the interests of the child, and it ordered R.E. to submit to genetic testing to determine the child’s relationship to R.E. On May 19, 2005, the guardian ad litem moved the juvenile court to allow the child to be released from the hospital into the custody of the child’s maternal grandmother, G.W. (“the grandmother”); the juvenile court granted that motion. The next day, the grandmother filed in the juvenile court both a complaint seeking custody of the child and a dependency complaint.[1]
In May 2005, R.E. moved the juvenile court for an award of temporary custody of the child, alleging that the court-ordered genetic testing had indicated a 99.9998% probability that he was the child’s biological father. R.E. also filed in the juvenile court a document dated May 25, 2005, purporting to be a report of the genetic-test results (“the May 25, 2005, report”). The record indicates that the child remained in the custody of the grandmother and that the parties filed several motions in the juvenile court with regard to disputes over R.E.’s rights to visit the child. On June 3, 2005, the juvenile court ordered the Alabama Department of Human Resources to conduct investigations on the homes of R.E. and the grandmother.
On October 3, 2005, the grandmother filed an objection pursuant to § 26-17-12(c), Ala.Code 1975, to the admission into evidence of the May 25, 2005, report. Section 26-17-12(e) allows a party to file an objection to the admissibility of genetic-testing results within 15 days of the hearing at which the test results might be introduced. It also provides that in the absence of an objection to the admissibility of the genetic-testing results, the results are admissible without the need to prove the authenticity or accuracy of the test. § 26-17-12(c), Ala.Code 1975.
In March 2006, R.E.’s mother, V.E.B., filed in the juvenile court what she characterized as a dependency complaint in which she sought an award of custody of the child. As the basis for her seeking custody of the child, V.E.B. cited only the fact that there had been disputes with the grandmother regarding R.E.’s and V.E.B.’s desire to visit the child.
On May 24, 2006, the juvenile court conducted an ore tenus hearing on the pending custody petitions. At that hearing, R.E. attempted to establish that he and the child’s mother had been common-law married at the time of the child’s birth and, therefore, that he was the presumed father of the child. Pursuant to § 26-17-5(a)(1), Ala.Code 1975, a man is presumed to be the father of a child if he was married to the child’s mother at the time of the child’s birth.[2] A presumption of pater *567 nity under § 26-17-5(a), once established, may be rebutted only by the presentation of clear and convincing evidence indicating that the presumed father is not actually the child’s natural father. § 26-17-5(b). During the May 24, 2006, hearing, R.E. expressly declined to attempt to offer into evidence the May 25, 2005, report.[3]
At the May 24, 2006, hearing, the grandmother disputed R.E.’s paternity. The grandmother also argued that R.E. had failed to comply with the terms of the Putative Father Registry Act, § 26-10C-1, Ala.Code 1975 (“the PFRA”). Therefore, the grandmother argued, pursuant to the PFRA, R.E. is deemed to have given his consent to an adoption of the child. At the time of the hearing, however, no adoption proceeding had been filed with regard to the child. During the May 24, 2006, hearing, the grandmother indicated her intention to file a petition to adopt the child should R.E. be unsuccessful in establishing a presumption of paternity through his claim of the existence of a common-law marriage.
On May 30, 2006, the juvenile court entered an order in which it determined that R.E. had not proven his claim of the existence of a common-law marriage between the child’s mother and him. The court noted that “no evidence was otherwise presented to establish [R.E.’s] paternity.” However, the juvenile court then ordered the child to submit to genetic testing and indicated that it would consider the issue of R.E.’s paternity after the completion of that genetic testing.[4] Thereafter, on June 1, 2006, R.E. filed a motion to allow him to instead introduce the May 25, 2005, report, “if properly authenticated.”
In response to the juvenile court’s May 30, 2006, order, the grandmother filed an objection to the juvenile court’s consideration of the genetic-test results. Among other things, the grandmother argued that all the parties’ evidence and arguments had already been presented and that reopening the case to allow R.E. to submit additional evidence that he had declined to present originally was improper. See § 6-8-103, Ala.Code 1975. On August 2, 2006, the guardian ad litem submitted a recommendation to the juvenile court that the grandmother be awarded custody of the child.
At a September 13, 2006, hearing, the juvenile court heard the arguments of the parties concerning, among other things, their positions on whether the genetic-test results should be admitted. At that hearing, the grandmother again objected to the court’s consideration of additional evidence. She argued that R.E. had proceeded under another theory in attempting to *568 establish his paternity and that the genetic test had not been authenticated. At the conclusion of that hearing, the juvenile court indicated that it had concerns about the equity of not allowing R.E. to submit the results of the genetic testing into evidence. However, the juvenile court did not rule, either at that hearing or in any written order, on the admissibility of any genetic-testing results.
In October 2006, the grandmother filed in the Montgomery Probate Court (“the probate court”) a petition to adopt the child. On October 11, 2006, the grandmother filed in the juvenile court a document entitled “notice of filing for adoption,” in which she notified the juvenile court of the adoption proceeding then pending in the probate court. The grandmother also filed another objection to the juvenile court’s consideration of the May 25, 2005, report.
At a hearing conducted on October 11, 2006, the juvenile court heard arguments concerning why the parties had failed to comply with its May 30, 2006, order requiring them to conduct genetic testing. At the conclusion of that hearing, the juvenile court again ordered a genetic test, and it specified that the results of the test were to be filed in the court. The results of an October 23, 2006, genetic test are contained in the record, and those results indicate a 99.999% probability that R.E. is the child’s natural father.
In November 2006, the grandmother moved to stay the proceedings in the juvenile court pending the resolution of her petition to adopt the child. In February 2007, R.E. moved to remove the adoption proceeding from the probate court to the juvenile court and to consolidate the adoption proceeding with those proceedings already pending in the juvenile court.
On March 2, 2007, the juvenile court entered a detailed judgment in which it granted R.E.’s custody petition, denied the grandmother’s and V.E.B.’s custody claims, and awarded the grandmother visitation rights.[5] In its judgment, the juvenile court did not formally adjudicate R.E.’s paternity of the child. However, given the nature of the findings contained in that judgment, the award of custody to R.E., and the juvenile court’s referral to R.E. throughout its judgment as “the father,” we conclude that the adjudication of R.E.’s paternity was implicit in the March 2, 2007, judgment.
In reaching its March 2, 2007, judgment, the juvenile court relied, in part, on the results of the October 23, 2006, genetic test. In doing so, the juvenile court noted that R.E. had failed to attempt to submit the May 25, 2005, report into evidence during the May 24, 2006, hearing and that it had ordered that the results of the October 23, 2006, genetic test be “filed” in the court. The juvenile court did not find that the genetic-test results should be admitted into evidence over the grandmother’s objection. Rather, the juvenile court stated in its judgment that it had taken “judicial *569 notice of the results of’ of the October 23, 2006, genetic test.
The guardian ad litem, on behalf of the child, and the grandmother each filed a postjudgment motion; the juvenile court denied those motions. The guardian ad litem, on behalf of the child, and the grandmother each filed a timely notice of appeal. Those appeals were consolidated.
The grandmother and the guardian ad litem (hereinafter together referred to as “the appellants”) argue that the juvenile court erred in taking judicial notice of the genetic-test results. Rule 201, Ala. R. Evid., allows a court to take judicial notice of certain facts, even ex mero motu. See Rule 201(b) (“A court may take judicial notice whether requested or not.”).
“A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.”
Rule 201(b), Ala. R. Evid. This rule has been explained as follows:
“Consistent with historic practice, a court is to dispense with the customary methods of proof ‘only in clear cases.’ Fed.R.Evid. 201 advisory committee’s note. A court is to take judicial notice of adjudicative facts only when those facts are beyond reasonable dispute either because they are generally known within the court’s territorial jurisdiction or because they can be accurately and readily determined by consulting sources that are acknowledged to be accurate. This limit upon judicial notice is consistent with historic Alabama law. See, e.g., Peebles v. Miley, 439 So.2d 137 (Ala.1983) (court judicially knows that great majority of collections are done on a contingent fee basis); Strother v. Strother, 355 So.2d 731 (Ala.Civ.App.1978) (judicial notice of increases in cost of living due to inflation); Mutual Bldg. & Loan Ass’n v. Moore, 232 Ala. 488, 169 So. 1 (1936) (facts found in reliable source).”
Advisory Committee Notes, Rule 201, Ala. R. Evid. (emphasis added).
The appellants argue that facts such as the results of a particular genetic test are not matters within the common or general knowledge. See Kmart Corp. v. Bassett, 769 So.2d 282, 286 (Ala.2000) (“A court may take judicial notice of certain facts that are within the common knowledge.”). Whether a matter is within the common or general knowledge is a question resolved by determining “what reasonably intelligent people in the community know.” 2 Charles W. Gamble, McElroy’s Alabama Evidence § 480.01(2) at 1836 (5th ed. 1996). The determination whether a particular fact is within the general or common knowledge of the community is within the trial court’s discretion. Kmart Corp. v. Bassett, 769 So.2d at 286; Henry v. Butts, 591 So.2d 849, 852 (Ala.1991). The appellants contend that in taking judicial notice of the result of the October 23, 2006, genetic test, the juvenile court abused or exceeded its discretion.
In Alabama, courts have taken judicial notice of the fact that a skidding automobile is difficult to control and the fact that the market value of a used automobile is less than the market value of a new automobile. See Mink v. Brown, 276 Ala. 3, 158 So.2d 647 (1963), and Mobile Dodge, Inc. v. Ladnier, 45 Ala.App. 210, 228 So.2d 478 (Civ.1969). See also Henry v. Butts, supra (trial court did not abuse its discretion in failing to take judicial notice that there are 5,280 feet in a mile); Watters v. Lawrence County, 551 So.2d 1011 (Ala.1989) (taking judicial notice of the fact that *570 Decatur is not located in Lawrence County); Clayton v. Kroger Co., 455 So.2d 844 (Ala.1984) (taking judicial notice that it was not dark between 7:20 p.m. and 7:40 p.m. on July 6); Kessler v. Stough, 361 So.2d 1048 (Ala.1978) (taking judicial notice that use of certain property as a church building would entail regular public gatherings at the property); Opinion of the Justices No. 228, 335 So.2d 376 (Ala.1976) (taking judicial notice of facts contained within the most recent federal decennial census); and Louisville & Nashville R.R. v. Harris Transfer Co., 293 Ala. 121, 300 So.2d 378 (1974) (taking judicial notice that a railroad company was a common carrier).
However, Alabama courts have concluded that some matters are outside the general or common knowledge and, therefore, not appropriate for judicial notice. For example, our supreme court has refused to take judicial notice that an arsenal was a “sole hub” for certain Army activities. See Westwind Techs., Inc. v. Jones, 925 So.2d 166, 171 (Ala.2005) (“Although the activities of Redstone Arsenal in Madison County might well form a part of the common knowledge of every person of ordinary understanding and intelligence in Madison County, whether Redstone Arsenal represents the ‘sole hub of procurement and acquisitions’ for the aviation branch of the United States Army would not be a matter susceptible of such common knowledge.”); see also Argo v. Walston, 885 So.2d 180, 183 (Ala.Civ.App.2003) (concluding that the trial court erred in determining the appropriate amount of damages when that determination was based in part on the judge’s personal knowledge about fishing ponds). Also, in Foodtown Stores, Inc. v. Patterson, 282 Ala. 477, 484, 213 So.2d 211, 217 (1968), our supreme court concluded that the reasonableness of certain bills for medical treatment and medication were matters “outside the realm of common knowledge.”
In the context of criminal cases, § 36-18-30, Ala.Code 1975, governs the admissibility of genetic and DNA testing. However, “ ‘once a particular theory or technique has satisfied § 36-18-30, a court may take judicial notice of that theory or technique’s reliability.’ ” Blackmon v. State, [Ms. CR-01-2126, Aug. 5, 2006] — So.2d —, — (Ala.Crim.App.2005) (quoting Turner v. State, 746 So.2d 355, 362 (Ala.1998)). Neither the parties’ briefs nor this court’s research have revealed a similar statute or rule concerning the use of genetic tests in civil cases.
This court has not been asked to consider whether genetic testing such as that performed in this case was such that its reliability could be judicially noticed, as would be possible in other contexts under § 36-18-30. Regardless, such a holding would not dispose of the issue raised in this appeal because the reliability of the October 23, 2006, genetic test or similar genetic-testing procedures was not the matter subject to judicial notice in this case. Rather, the juvenile court took judicial notice of the specific results of the October 23, 2006, genetic test. We must conclude that the results of a particular genetic test cannot be said to be within the general or common knowledge of the community.
The second part of Rule 201(b) allows a court to take judicial notice of facts that are “capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.” The sources to which that subsection refers, however, are in the nature of reference tools or documents. As explained by a popular treatise, “[wjhether the date on a document fell on a Sunday, for example, could be determined by consulting a calendar. It would seem entirely appropriate *571 to call upon the court to take judicial notice of the definition in a dictionary. An official state map likewise could be consulted.” 2 Gamble, McElroy’s Alabama Evidence § 480.01(3) at 1837 (footnotes omitted). In concluding that a trial court did not err in taking judicial notice of the fact that a “coronary occlusion” means “heart trouble,” our supreme court explained:
“ ‘It is customary for courts to take judicial knowledge of what ought to be generally known within the limits of their jurisdiction. This cognizance may extend far beyond the actual knowledge, or even the memory of judges, who may therefore resort to such documents of reference, or other authoritative sources of information as may be at hand, and may be deemed worthy of confidence. The rule has been held, in many instances, to embrace information derived informally by inquiry from experts.’ ”
Green v. Mutual Benefit Health & Accident Ass’n, 267 Ala. 56, 59, 99 So.2d 694, 697 (1957) (quoting Hodge v. Joy, 207 Ala. 198, 201, 92 So. 171, 174 (1921), quoting in turn Gordon, Rankin & Co. v. Tweedy, 74 Ala. 232, 237-38 (1883)) (emphasis added).
In taking judicial notice of the results of the genetic test, the juvenile court in this case did not refer to a source “whose accuracy cannot reasonably be questioned.” See Rule 201(b)(2), Ala. R. Evid. Rather, it relied upon the very piece of evidence to which the grandmother objected and whose evidentiary foundation she had questioned.
We must conclude that the juvenile court could not properly take judicial notice of the results of the October 23, 2006, genetic test under either subsection of Rule 201(b), Ala. R. Evid. Accordingly, we must conclude that the juvenile court erred in purporting to take judicial notice of the results of the genetic test.
A correct judgment, even if it is based on a wrong reason, may be affirmed. Transamerica Commercial Fin. Corp. v. AmSouth Bank, N.A., 608 So.2d 375, 378 (Ala.1992). Therefore, this court has considered whether the juvenile court could have properly relied on the results of the genetic test on the basis that those results were properly admitted into evidence. However, as discussed below, we cannot conclude that those test results were admissible in evidence.
During the final hearing, R.E. elected to proceed solely under the theory of the existence of a common-law marriage in his attempt to establish his paternity of the child; he did not attempt to offer the May 25, 2005, report into evidence. Later, in his June 1, 2006, motion to introduce the May 25, 2005, report, R.E. asked that “the prior [genetic] test results ... be subpoenaed, and, if properly authenticated, presented to this court for a further determination of paternity.” (Emphasis added.) Later, after the October 23, 2006, genetic test was conducted, R.E. filed the results of that test in the juvenile court. However, no attempt was made to authenticate either of the genetic tests or their results, nor was any other attempt made to lay the proper evidentiary foundation for the admission of those test results. See Rule 901(a), Ala. R. Evid. (evidence must be properly authenticated and identified as a prerequisite to admissibility). Therefore, we cannot conclude that the juvenile court could have properly relied on the results of either genetic test on the basis that the results of either of those tests were admissible into evidence.
Accordingly, we must conclude that the juvenile court erred in relying on the genetic-test results in determining R.E.’s paternity of the child, and we therefore reverse the juvenile court’s judgment. In reaching our holding, we note that, in the *572 March 2, 2007, judgment, the juvenile court made findings to the effect that R.E. had “substantially complied” with the spirit of the PFRA and that both parties submitted arguments to this court with regard to that issue. However, although the grandmother had asserted R.E.’s failure to comply with the PFRA as a defense to the custody claims asserted in the juvenile court, that defense is actually relevant to whether R.E.’s consent to an adoption of the child could be implied. At the time the March 2, 2007, judgment in this case was entered, the adoption proceeding instituted by the grandmother was still pending in the probate court,[6] and the juvenile court’s judgment does not affect the adoption proceeding.
REVERSED AND REMANDED.
PITTMAN, BRYAN, and THOMAS, JJ., concur.
MOORE, J., concurs in the result, without writing.

. In the record on appeal, all the pleadings, motions, and orders mentioned above contain date stamps indicating that those documents were filed in the juvenile court on June 1, 2005. However, the signature lines on the documents and subsequent references to them in the record and in the briefs on appeal consistently indicate that the documents were actually filed on the dates stated above. Accordingly, we have elected to use those dates in describing the procedural history of this action.

. The parties have not challenged the authority of the juvenile court to resolve the com *567 mon-law marriage issue, and, in resolving this appeal, we do not address the issue of whether it had that authority.

. The relevant portion of the transcript reads as follows:
"[Attorney for grandmother]: Your Hon- or, he is seeking to introduce — I think he is seeking to introduce the DNA results.
"[Attorney for R.E.]: No. I'm just — I'm— once — I'm going to establish a common-law marriage. That's my attempt to establish common-law marriage. Once I do that, the baby was born during the marriage, if there was a rebuttal presumption that the child is born of the marriage so I don't need the DNA results, if I can establish that there was a common-law marriage.
"THE COURT: Uh-huh.
"[Attorney for R.E.]: That’s simply what I'm going to attempt to do.”

. A different judge had previously ordered the genetic test referenced in the May 25, 2005, report. It appears that because R.E. did not attempt to submit evidence regarding the results of that genetic test during the May 24, 2006, evidentiary hearing, the juvenile judge who was then hearing the case was not aware that the parties had already conducted genetic testing.

. We disagree with the characterization made by R.E. in his brief submitted to this court that this case is a dependency action. R.E. cites only to two pleadings styled as "dependency complaints” in support of his contention. However, the juvenile court's treatment of this case and its disposition of the issues indicates that that court concluded that this was a custody dispute contingent upon a paternity adjudication rather than a dependency proceeding. See J.A.P. v. M.M., 872 So.2d 861, 866 (Ala.Civ.App.2003) (holding that the case was more in the nature of a custody proceeding than a dependency proceeding despite the fact that some of the pleadings had been styled as though they pertained to "dependency” matters). Given the facts of this case, we cannot say that R.E. has demonstrated that this action should be considered a dependency action.

. The probate court entered an order transferring the adoption proceeding to the juvenile court. See § 12-12-35, Ala.Code 1975 (allowing such a transfer). The probate court's transfer order was filed in the juvenile court on March 6, 2007, after the entry of the juvenile court’s March 2, 2007, judgment. Therefore, the juvenile court's March 2, 2007, judgment resolved only the custody claims presented to that court, and the adoption proceeding remains pending before the juvenile court.